**Anthony ALLEN, Plaintiff,**

v.

**Simon L. LEIS, Jr., et al., Defendants.**

**No. C–1–00–261.**

United States District Court,
S.D. Ohio,
Western Division.

June 19, 2001.

Stephen R. Felson, Robert Brand Newman, Newman & Meeks Co LPA, Cincinnati, OH, for Plaintiff.

Elise W. Porter, Darrell M. Pierre, Jr., Ohio Attorney General, Columbus, OH, for Intervenor.

Shannon M. Reynolds, Hamilton County Prosecuting Attorney, C. Joseph McCullough, Hamilton County Prosecutor, Civil Unit, Cincinnati, OH, for Defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Plaintiff's Motion to Certify the Class (doc. 7); Defendants' Response (doc. 15), to which Plaintiff did not file a Reply; Plaintiff's Motion for a Preliminary Injunction (doc. 8); Defendants' Response (doc. 15); Plaintiff's Reply (doc. 19); the Ohio Attorney General's Notice of Intervention and Motion to Extend the Time to File a Response Motion to Plaintiff's Motion for a Preliminary Injunction (doc. 17); Intervenor Attorney General's Post–Hearing Brief in Support of Ohio Revised Code § 341.06 (doc. 22); Defendants' Motion for Summary Judgment (doc. 18); and Plaintiff's Response (doc. 19), to which Defendants did not file a Reply.

In addition, the Court held a Hearing in this matter on Thursday, May 10, 2001 (doc. 21).

The Complaint in this case asserts a constitutional challenge to Hamilton County's application of an Ohio state statute, which allegedly permits counties and sheriff's offices throughout the state to be reimbursed by prisoners and criminal offenders for the government's confinement costs and booking fees (*see* doc. 1). *See also* Ohio Rev.Code § 341.06. The County Defendants have moved this Court for an entry of summary judgment in their favor as a matter of law (*see* doc. 18). We conclude that there exist genuine issues of material fact which prevents this Court from finding in favor of the County Defendants as a matter of law, and, therefore, this matter will be permitted to proceed forward to a trial on the merits.

Accordingly, for the reasons set forth below, the Court hereby DENIES Defendants' Motion for Summary Judgment (doc. 18), and a status conference is hereby SCHEDULED in this matter for the Parties in this case on Tuesday, June 19, 2001, at 3:00 P.M.

An outline of the Court's discussion of Ohio Revised Code Section 341.06 is as follows:

I. BACKGROUND .......................................................1246
. A. An Introduction to the Parties and the Complaint .........................1246
 1. The Parties ...............................................1246
 2. The Complaint ...........................................1246
 B. Factual History .............................................1247
 1. Section 341.06 .........................................1247
 2. The Attorney General's Opinion Letter .....................1248
 3. The Hamilton County "Pay–for–Stay" Program .....................1248
 4. Plaintiff's Arrest, Incarceration, and Book–in–Fee ......................1250
 C. Procedural History ..........................................1251
 1. Introduction ............................................1251
 2. The Intervenor Attorney General .................................1252
 D. The May 10, 2001 Hearing ...................................1252
 1. Plaintiff's Motion for a Preliminary Injunction ........................1252
 2. Compensatory and Punitive Damages .....................1253
 3. The Intellitect Corporation ..............................1253
 4. Waiver and Refund ......................................1253
 5. Plaintiff's Motion for Class Certification .....................1254

II. THE STANDARD OF REVIEW ........................................1254

III. DISCUSSION .......................................................1254
 A. Defendants' Motion for Summary Judgment ..............................1254
 1. Introduction ............................................1254
 2. Defendants' Arguments ..................................1255
 3. Plaintiff's Arguments ....................................1255
 4. The Intervenor's Arguments .............................1257
 B. The Court's Analyses ........................................1258
 1. Introduction to the Parties' Claims and Defenses ......................1258
 2. Count I of the Complaint ................................1259
 3. Qualified Immunity ......................................1261
 4. Eleventh Amendment Immunity ...................................1262

IV. THE COURT'S CONSTITUTIONAL REVIEW ...........................1264
 A. Introduction ................................................1264
 B. The Fourteenth Amendment .................................1265
 1. Pretrial Detainees ......................................1265
 2. The Procedural Due Process Clause ......................1266
 3. The Equal Protection Clause .............................1268
 C. The Fourth Amendment ....................................1271
 1. Introduction ............................................1271
 2. The County Defendants "Seized" Plaintiff's Funds ......................1271
 3. Defendants' "Seizure" May Have Been Unreasonable ...................1273
 D. Case of *James Daniel Good Realty* and The *Matthews'* Test ...............1273
 1. United States v. James Daniel Good Realty .....................1273
 2. Matthews v. Eldrige .....................................1275
 3. Case of *Good* and the *Matthews'* Test Favor Plaintiff ..................1277
 E. Ohio Revised Code Section 341.06, As Applied by Defendants ...............1278
 1. The Pay–for–Stay Program May Be Unconstitutional ..................1278
 2. Any Signed Releases or Waivers May Be Invalid .....................1279
 3. Defendants' Post–Deprivation Procedures Are Inadequate ...............1279
 F. Ohio Revised Code Section 341.06 May Be Unconstitutional ...............1281
 1. Introduction ............................................1281
 2. Section 341.06 May Not Provide Adequate Due Process ................1281
 3. The Uniformity Clause of the Ohio Constitution .....................1283

V. THE *PULLMAN* ABSTENTION DOCTRINE .............................. 1284
 A. Introduction ............................................... 1284
 B. Railroad Comm'n of Texas v. Pullman Co. ................................ 1284
 C. The *Pullman* Doctrine May Not Be Applicable in this Case ................. 1285

VI. CONCLUSION ...................................................... 1285

## I. BACKGROUND

### A. *An Introduction To The Parties And The Complaint*

#### 1. *The Parties*

On April 5, 2001, Plaintiff, individually and on behalf of all other persons similarly situated, filed a Class Action Complaint against Defendants (doc. 1). In his Complaint, Plaintiff seeks actual and punitive damages, as well as injunctive and other equitable relief, pursuant to 42 U.S.C. § 1983, against Defendants for the alleged "violation of the rights of Plaintiff and all other class members under the Fifth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment," in levying the cost of confinement fees upon all pretrial detainees, regardless of their innocence or guilt (*Id.*). The proposed class consists of all persons whose funds were confiscated before conviction under the Hamilton County Pay–for–Stay Program (*Id.*).

In the case at bar, Plaintiff Anthony Allen was a resident of Cincinnati, Ohio at the time of his arrest in July of 1999, and was also the sole owner of the $ 30.00 cash currency that was taken by the County Defendants under its "Pay–for–Stay" Program (*Id.*). The Pay–for–Stay Program was allegedly promulgated and enacted pursuant to Ohio Revised Code § 341.06, also known as the "Prisoner Reimbursement Policy" (*Id.*).

Defendant Simon L. Leis, Jr. is the duly elected and qualified Sheriff of Hamilton County, Ohio, and is believed to be one of the principal promulgators of the Pay–for–Stay Program, which results in the allegedly "unconstitutional" levying of pretrial cost of confinement fines upon prisoners, such fines are known as "Book–in–Fees" (*Id.*). Defendant Leis has been sued in his official capacity only (*Id.*).

Defendants Tom Neyer and John Dowlin, at all relevant times hereto, were and are duly elected and qualified members of the Board of County Commissioners for Hamilton County, Ohio, and are believed to be one of the principal promulgators of the Pay–for–Stay Program which results in the levying of Book–in–Fee fines upon pretrial detainees (*Id.*). This Court takes judicial notice that Defendants Neyer and Dowlin are sued in both their official and individual capacities and are considered to be duly elected and qualified members of the Board of County Commissioners (*Id.*).

In addition, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Todd Portune is automatically substituted for Defendant–Commissioner Bob Bedinghaus in his official capacity only, since he has succeeded Mr. Bedinghaus in public office as a newly-elected member of the Hamilton County Board of County Commissioners. However, Plaintiff's claims against Defendant Bedinghaus, in his individual capacity, are not necessarily affected by the succession in public office of now Defendant–Commissioner Todd Portune.

#### 2. *The Complaint*

On April 5, 2000, Plaintiff filed this action, on behalf of himself and a proposed class of similarly situated plaintiffs, pursuant to Title 42 U.S.C. § 1983, against the above-named County Defendants. In his single-count Complaint, Plaintiff alleges that the County Defendants violated Plaintiff's constitutional rights that are secured

by the Fifth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, against the taking of personal property without due process of law by adopting a policy, pursuant to Ohio Revised Code § 341.06, the "Prisoner Reimbursement Policy." Section 341.06 authorizes county sheriffs to seek reimbursement from pretrial detainees and convicted prisoners related to the administrative costs of their confinement (*Id.*).

Jurisdiction over the sole claim of this action is conferred upon this Court by Title 28 U.S.C. §§ 1331 and 1343 (*Id.*). The substantive federal claim is brought by Plaintiff under 42 U.S.C. § 1983.

### B. *Factual History*

The following facts are generally undisputed by the Parties in this case, unless otherwise noted, and are taken from the Parties' respective briefs (*see* docs. 1, 3, 18 & 19). The Court views these facts in a light most favorable to the non-movant party, which in this case is the Plaintiff. *See* Fed.R.Civ.P. 56.

### 1. *Section 341.06*

In 1996, the Ohio Legislature enacted Revised Code § 341.06, which is titled the "Prisoner Reimbursement Policy; Fees for Medical Treatment or Services."[1] The relevant portion of the statute in question reads as follows:

(A)(1) In lieu of requiring offenders to reimburse the county for expenses incurred by reason of the person's confinement under section 341.14 or 341.19 of the Revised Code, the board of county commissioners, in an agreement with the sheriff, may adopt a prisoner reimbursement policy for the jail pursuant to this section to be administered in the jail

under the sheriff's direction. The sheriff may appoint a reimbursement coordinator to administer the jail's reimbursement policy.

(2) A prisoner reimbursement policy adopted under this section is a policy that requires a person confined to the jail to reimburse the county for any expenses it incurs by reason of the person's confinement in the jail, which expenses may include, but are not limited to, the following:

(a) A per diem fee for room and board of not more than sixty dollars per day or the actual per diem cost, whichever is less, for the entire period of time the person is confined to the jail . . .

(c) Reimbursement for county property damaged by the person while confined to the jail.

Rates charged shall be on a sliding scale determined by the sheriff with the approval of the board of county commissioners based on the ability of the person confined to the jail to pay and on consideration of any legal obligation of the person to support a spouse, minor children, or other dependents and any moral obligation to support dependents to whom the person is providing or has in fact provided support.

The reimbursement coordinator or another person designated by the sheriff may investigate the financial status of the confined person and obtain information necessary to investigate that status, by means that may include contacting employers and reviewing income tax records. The coordinator may work with the confined person to create a repayment plan to be implemented upon the person's release. At the end of the person's incarceration, the person shall be

---

1. Ohio Revised Code § 341.06 was amended on September 22, 2000, but the changes in the statute at that time have no effect on the relevant facts and issues of this case (*see* doc. 18).

presented with a billing statement signed by the sheriff.

(3) The reimbursement coordinator or another person designated by the sheriff may collect, or the sheriff may enter into a contract with one or more public agencies or private vendors to collect, any amounts remaining unpaid. Within twelve months after the date of the confined person's release, the prosecuting attorney may file a civil action to seek reimbursement from that person for any billing amount that remains unpaid. The county shall not enforce any judgment obtained under this section by means of execution against the person's homestead....

(4) Any reimbursement received under division (A)(3) of this section shall be credited to the county's general fund to be used for general fund purposes....

Ohio Rev.Code § 341.06(A) (West 2001).

On December 3, 1998, the Board of Hamilton County Commissioners and the Hamilton County Sheriff entered into an agreement and adopted a Prisoner Reimbursement Policy (also referred to as the "Pay–For–Stay Program"), as set forth in Ohio Revised Code § 341.06(A) (see doc. 18, Ex. A). Specifically, the Prisoner Reimbursement Policy requires any person confined in the Hamilton County Justice Center ("HCJC") to reimburse Hamilton County and the Sheriff's Office for expenses incurred by reason of that person's confinement.

The expenses included a thirty-dollar ($30.00) Book–in–Fee in order to allegedly help defray a portion of the booking fee and confinement costs involved in processing pretrial prisoners, also known as pretrial detainees. The Pay–for–Stay Program and the Book–in–Fee are the primary focus of Plaintiff's Complaint, as well as the subject of Plaintiff's Motions for Class Certification (see doc. 7), Plaintiff's Motion for a Preliminary Injunction (see doc. 8), and Defendants' Motion for Summary Judgment (see doc. 18).

### 2. The Attorney General's Opinion Letter (doc. 18 Ex. B)

The Ohio Attorney General has issued and published a Legal Opinion Letter regarding the prisoner reimbursement policies that may be promulgated pursuant to Ohio Revised Code § 341.06 (doc. 18, Ex. B). In its March 16, 1999 Opinion Letter # 99–021 addressed to Kevin J. Baxter, Erie County Prosecuting Attorney, the Honorable Betty D. Montgomery advised that a board of commissioners may adopt a prisoner reimbursement policy, pursuant to Ohio Revised Code § 341 .06, that requires a person to reimburse the county for the costs it incurs when the person is processed for confinement in the county jail. The Opinion Letter of the Attorney General specifically asserts that book-in-fees are costs of confinement, and, therefore, that book-in-fees qualify as permissible charges subject to reimbursement as stated in § 341.06.

However, Opinion Letter # 99–021 does not address the issue of whether a pretrial detainee is entitled to notice and an opportunity to be heard. Nor does the Opinion Letter answer the question as to when should such confinement costs be assessed; before or after a prisoner is convicted by a jury or pleads guilty to a criminal charge. Finally, Opinion Letter # 99–021 does not provide a method or time frame as to how or when to reimburse those detainees who are acquitted or whose charges are later dismissed.

### 3. The Hamilton County "Pay–for–Stay" Program (doc. 18)

The Hamilton County Prisoner Reimbursement Policy or the Pay–for–Stay Program was implemented soon after the Board of Commissioners and Sheriff Leis

agreed to its adoption (doc. 18 & Dale C. McMillian Dep.). According to the County Defendants, the Hamilton County Pay–for–Stay Program is supposed to follow the following procedure (*see* doc. 18).

Upon arrival at the HCJC, the pretrial detainee or prisoner is immediately taken to a booking window for initial processing. A processing clerk receives paperwork from the arresting officer and the corrections officer related to the prisoner criminal charges. The processing clerk then gives the corrections officer a form titled, a "Release of Funds Waiver" (*see* doc. 18, Ex. C.). At that point, the correction officer is supposed to explain the Prisoner Reimbursement Policy to the prisoner, and asks him or her to then read the Release of Funds Waiver. If the prisoner is illiterate, the corrections officer is supposed to read the Waiver aloud to the prisoner.

The corrections officer then proceeds to explain to the prisoner that a state law allows the Sheriff to require prisoners to reimburse the County for expenses associated with the costs of confinement. *See* Ohio Rev.Code § 341.06. The prisoner is also supposed to be informed that he or she can apply for a full refund of the Book–in–Fee if the criminal charges against him or her are ultimately dismissed in the prisoner's favor or if the prisoner is acquitted of the charges.

To apply for a refund, a prisoner is advised to bring the proper documentation to the Property Window at the HCJC. A prisoner can also receive a refund by calling the Sheriff's Office directly during normal business hours using the telephone number listed on the Release of Funds Waiver form (*see* doc. 18, Ex. C).

Defendants assert that a corrections officer then attempts to answer any questions that a prisoner might have regarding the Reimbursement Policy and asks the prisoner to voluntarily sign the Release of Funds Waiver. A copy of the Release of

Funds Waiver is then provided to the prisoner at the point of initial intake or processing, and reads as follows:

I _____, have read and acknowledge that certain monies are owed for the pay-for-stay program. I authorize and grant my permission that a $30.00 booking fee and/or per diem amount to be removed from my commissary/property account, cash on hand, check or my personal credit card.

I further authorize and grant permission to the Hamilton County Sheriff to deduct the amount due from my commissary/property account for purpose of paying for the costs outlined herein including any previous costs incurred during prior incarcerations ...

If the charges for which you were booked are dismissed or you are found not guilty of the charges, then you may be reimbursed your book-in-fee by bringing proper documentation to the Hamilton County Sheriff's Corrections Property Window (next to visiting desk), 1000 Sycamore Street, Cincinnati, Ohio 45202 (513/946–6335). Hours of operation are Monday–Friday, 8:00 A.M. to 3:00 P.M. except holidays.

(doc. 8, Ex. 2). According to Defendants, the monies collected from the Book–in–Fees are set aside in a separate account that is credited to either Hamilton County or the Sheriff's Office, and those funds are then placed in the general operating fund (doc. 8).

Next, the prisoner's personal property is placed on the processing counter and inventoried. The processing clerk logs the property as it comes across the counter and places it in a plastic bag. A receipt is generated and explained to the prisoner. The prisoner is requested to confirm the accuracy of the receipt and sign it as well.

The prisoner's "cash-on-hand" is separately inventoried on a "money form re-

ceipt." The money form reflects the amount of cash inventoried, minus the Book–in–Fee, and is given to the prisoner to confirm its accuracy. Once again, the prisoner is asked to sign the form. The receipts are placed in the prisoner's personal property bag. The amount of the prisoner's cash that is actually applied to the Book–in–Fee is kept in a separate envelope from the prisoner's remaining cash.

The remaining cash is deposited with the County Treasurer and applied to the prisoner's inmate account. The Book–in–Fee is also deposited with the County Treasurer, however, that fee is then placed in the general operating fund and applied as reimbursement for the cost of the prisoner's confinement. It is undisputed in this case that the Book–in–Fee is separated from the remainder of a prisoner's cash and other personal items as a matter of routine during the prisoner's initial processing upon arrest at the HCJC, without the benefit of notice, a hearing, or judicial review.

At the conclusion of the prisoner's confinement in the HCJC, all personal property is returned to the prisoner at the HCJC's Property Window with their corresponding receipts, except for the $30.00 Book–in–Fee that was taken during the prisoner's initial intake processing. As stated above, if the criminal charges are dismissed or the prisoner is acquitted of the charges, then he or she may apply for a refund of the Book–in–Fee.

The refund can be requested either in-person or by telephone. According to Defendants, a great majority of the Book–in–Fee refunds are requested by telephone. Upon request of the prisoner, whose charges have either been dismissed or acquitted, the disposition of the criminal case is checked by jail employees and if it meets the required criteria, a refund check is issued from the County to the prisoner's last known address in approximately 4–6 weeks.

The Pay–for–Stay Program was originally designed by a private contractor, the "Intellitech Corporation," which according to the terms of its contract, received a 50⁄50 split of the "profits" until Hamilton County recouped its initial $12,000.00 investment (doc. 8). Thereafter, Intellitech would receive 70% of the profits and the County would then get 30% (doc. 8, Ex. 7).

Plaintiff further asserts that the agreement between Hamilton County and the Sheriff's Office indicates that the taking of funds from pretrial detainees are not purely at the option of the detainee, regardless of whether he or she signs a Waiver form. According to Plaintiff, the agreement states, in pertinent part:

A person confined to the County Jail *shall be required to reimburse the County for any expenses incurred by reason of the person's confinement in the County Jail,* which expenses may include, but are not limited to the following:

(a) a minimum Book–in–Fee of thirty dollars $30.00. (doc. 8, Ex. 1) (emphasis added). The confinement costs and processing charges are said to be subject to a sliding scale (*Id.*).

### 4. *Plaintiff's Arrest, Incarceration, and Book–in–Fee*

In the case at bar, on July 18, 1999, Plaintiff Anthony Allen was arrested by a Cincinnati police officer on an allegedly outstanding felony forgery warrant and transported to the HCJC immediately thereafter (see doc 1, 19 & Anthony Allen Dep.). Prior to that arrest, it is undisputed that Plaintiff had never been arrested before. Plaintiff was taken to the intake area where he was then processed into the HCJC.

Plaintiff's personal property, including $100.00 in cash, was inventoried by a processing clerk and the corrections officer. The processing clerk separated $30.00 in cash from Plaintiff's $100.00 cash total, pursuant to the Prisoner Reimbursement Program. Plaintiff does acknowledge that he signed the Release of Funds Waiver and further identified his signature on the Waiver form (*see* doc. 18, Ex. C).

Plaintiff also admits that, at the time of his initial processing, he did not object to the taking of the Book–in–Fee by Defendants to any of the HCJC personnel, either verbally or in writing, at any time during his confinement in the jail. Apparently, the first time Plaintiff voiced a complaint regarding the $30.00 Book–in–Fee was immediately after he was released from the HCJC, was outside the building with his family, and apparently noticed that $30.00 from his original $100.00 in cash was not returned to him upon making bail.

The day after Plaintiff was released from the HCJC, he was advised by a Cincinnati police officer that the criminal charges filed against him would be dismissed. Apparently, while it was true that the police computer contained an entry for a "Warrant and Arrest" with Plaintiff's correct name and social security number, Plaintiff in fact had no outstanding arrest warrant and was released after his initial Arraignment.

It is undisputed by the Parties to this action that, at no time after the charges were dismissed, did Plaintiff request or apply for a refund of the Book–in–Fee from the HCJC, either in person, by mail, or by phone. It is also undisputed by either Party that, as of the day of the May 10, 2001 Hearing, Plaintiff had still not sought a refund of his Book–in–Fee, which according to Defendants, he is still eligible to receive upon his request.

Defendants assert that, whenever Plaintiff decides to apply for his refund, his $30.00 Book–in–Fee refund would be mailed to him sometime in the following 4–6 weeks. Plaintiff responds by asserting that, he is fearful of having any further contact with the HCJC based on his mistaken arrest and his experiences at the HCJC.

## C. *Procedural History*

### 1. *Introduction*

On April 5, 2000, Plaintiff Anthony Allen filed a single-count civil Complaint in federal court against Defendants Hamilton County Sheriff Simon Leis, Jr. and the Hamilton County Board of Commissioners seeking the following forms of relief: (1) return of all confiscated funds, (2) compensatory and punitive damages, and finally, (3) attorney fees and litigation costs (*see* doc. 1). *See also* 42 U.S.C. §§ 1983 and 1988.

Shortly thereafter, Defendants filed their Answer asserting a general denial of Plaintiff's claims, as stated in his Complaint, and defending with numerous affirmative defenses in response, including the doctrine of qualified immunity and Eleventh Amendment Immunity (doc. 3). Specifically, Defendants denied "committing any wrongful or unlawful acts or omissions against Plaintiff and against all class members, as well as denying the allegations that they are responsible to Plaintiff(s) for any damages, punitive or otherwise" (*Id.*).

On February 28, 2001, Plaintiff filed a Motion for Class Certification, pursuant to Federal Rule of Civil Procedure 23(b)(2) and Local Rule 23.3, which this Court has not yet ruled on (doc. 7). Specifically, in his Motion, Plaintiff requests this Court to certify the following proposed class, which he describes as follows:

All persons whose funds were confiscated before conviction under the Hamilton County Pay–for–Stay Program.

(doc. 7).

Shortly thereafter, Plaintiff also filed a Motion for a Preliminary Injunction, pursuant to 42 U.S.C.1983, requesting this Court to require the Sheriff of Hamilton County "to cease confiscating the funds of pretrial detainees pursuant to the Defendants' Pay–for–Stay Program and to return all such confiscated sums" (doc. 8). The Court has also not ruled on Plaintiff's Motion for a Preliminary Injunction.

On April 27, 2001, Defendants filed their Response to Plaintiff's Motions for Certification and Injunction (doc. 15). In addition, Defendants followed with their own Motion for Summary Judgment as to all of the issues before this Court asserting that, there are no genuine issues of material fact and that Defendants are entitled to judgment in their favor as a matter of law (doc. 18). *See* Fed.R.Civ.P. 56.

On May 7, 2001, Plaintiff followed with a Reply to his Motion for a Preliminary Injunction, as well as a Response to Defendants' Motion for Summary Judgment (doc. 19).

### 2. *The Intervenor Attorney General*

In response to this Court's Leave to Intervene Order of April 25, 2001 (doc. 14), the Ohio Attorney General, the Honorable Betty D. Montgomery, filed a Notice of Intervention and Motion for Extension of Time, or in the Alternative, a Motion to File a Post–Hearing Brief (doc. 17).

Specifically, the Attorney General informed the Court that she was moving to intervene in this action, "but exclusively and expressly to defend the constitutionality of R.C. 341.06 on its face, and not to defend the Hamilton County policy. This is not to say that the Attorney General believes the Hamilton County policy to be unconstitutional, rather, the Attorney General's sole interest is to defend the facial constitutionality of R.C. 341.06, and she takes no position on any other issue in the case" (*Id.*). In addition, the Attorney General also requested an extension of time in which to file a memorandum in response to Plaintiff's Motion for Preliminary Injunction (*Id.*).

As of the date of this Order, none of the Parties to this action have filed an Objection or response brief to the Attorney General's Notice of Intervention. Therefore, the Court hereby GRANTS the Attorney General's unopposed Motion for Intervention (doc. 17), and EXTENDS the time in which the Attorney General has to file her supporting brief.

On May 23, 2001, the Intervenor Attorney General filed a Post–Hearing Brief in Support of Ohio Revised Code § 341.06 (doc. 22). Specifically, the Intervenor asserts in her brief that, if one assumes for the moment that Plaintiff is challenging the constitutionality of Ohio Revised Code § 341.06 on its face, the challenge should be dismissed for three reasons (*Id.*).

First, the Attorney General asserts that the proposed plaintiff's class lacks standing to challenge § 341.06 on its face. Second, the Attorney General contends that this Court should abstain from deciding the issue or certify this issue to the Ohio Supreme Court. Finally, the Attorney General maintains that the statute is constitutional under both the Due Process and Takings Clauses of the United States Constitution (*Id.*).

### D. *The May 10, 2001 Hearing*

On May 10, 2001, this Court held a Hearing on all of the pending Motions before us.

### 1. *Plaintiff's Motion for a Preliminary Injunction*

During the Hearing, Counsel for Defendants drew the Court's attention to pp. 5–6

of Plaintiff's Reply brief (doc. 19), which states, in pertinent part:

> The County is now holding, and was holding at the time the complaint was filed, hundreds of thousands of dollars seized from pretrial detainees, both those who were later convicted and those who were not. Each and every one of the seizures violated the Constitution. The most direct remedy for these violations is to require the County to give the money back in all cases. The County has done so with respect to less than three per cent of the funds wrongfully seized. *Plaintiff therefore does not need, nor does it any longer request, injunction or declaratory relief.*

(doc. 19 at 5–6) (emphasis added). Plaintiff's Counsel then informed the Court that Plaintiff was withdrawing his Motion for a Preliminary Injunction at this time for the reasons stated in his Reply brief (*Id.*).

Therefore, the Court hereby DENIES WITHOUT PREJUDICE Plaintiff's Motion for a Preliminary Injunction against the County Defendants (doc. 8).

## 2. *Compensatory and Punitive Damages*

During the Hearing, Counsel for Defendants drew the Court's attention to p. 15 of Plaintiff's Reply brief (doc. 19), which states, in pertinent part:

> The County makes only a "clearly established" argument (Doc. 15 at 32), and does not deal with the fact that *Plaintiff and the class members primarily wish to have their money returned and do not claim damages from the pockets of any of the Defendants.* In such an instance, the doctrine of qualified immunity does not apply.

(doc. 19 at 15) (emphasis added). Plaintiff's Counsel then informed the Court that Plaintiff was withdrawing his requested relief for compensatory and punitive damages in this case, and now only seeks an Order of Restitution to reimburse Plaintiff for the "confiscated funds" that were taken by Defendant (*see* doc. 1).

Therefore, the Court hereby DISMISSES WITHOUT PREJUDICE Plaintiff's requested claims of relief for compensatory and punitive damages against the County Defendants (*Id.*).

## 3. *The Intellitect Corporation*

During the Hearing, Counsel for the County Defendants informed the Court that the Intellitect Corporation was no longer collecting the Book–in–Fees for Hamilton County, but rather that the Sheriff's Office had taken over those previously contracted tasks completely and that the funds collected were now placed in either the Sheriff's Office or the County's general operating fund.

## 4. *Waiver and Refund*

Counsel for Defendants admitted during the Hearing that, even if a pretrial detainee was unwilling to sign the Waiver form, which "voluntarily" transfers the $30.00 Book–in–Fee from the detainee to the care of the Sheriff's Office, the $30.00 would, nonetheless, be taken by the HCJC personnel during the initial processing procedure. In addition, Counsel for Defendants was unable to provide the Court any details as to the general operating fund, how the detainee-collected funds are separated from the other operating fund monies, the percentage of Book–in–Fee refunds that goes uncollected, what efforts are made to locate a detainee who has not claimed his funds, as well as other details of the Pay–for–Stay Program.

Plaintiff's Counsel informed the Court that the reason that Plaintiff did not pursue his refund was because he was fearful of returning back to the HCJC, and that he did not want to have any further contact with the HCJC in order to secure his

$30.00 Book–in–Fee fees that were collected during his July 1999 arrest. Defendants assert the defense of waiver against Plaintiff for his failure to pursue his post-deprivation remedies.

### 5. Plaintiff's Motion for Class Certification

During the Hearing, the Court informed the Parties that once we decide the issues regarding Defendant's Motion for Summary Judgment (doc. 18), then, if still needed, we will address Plaintiff's Motion for Class Certification and schedule a status conference at a later date.

Therefore, the only issues that will be addressed in this Order are those put forth in Defendants' Motion for Summary Judgment (see doc. 18), Plaintiff's Response (see doc. 19), the Intervenor's Post–Hearing Brief (doc. 22), and those related arguments that were presented by the Parties at the May 10, 2001 Hearing in regard to Defendants' Motion for Summary Judgment (see doc. 21).

## II. THE STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Id. at 321, 106 S.Ct. 2548; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see Guarino, 980 F.2d at 405.

As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Guarino, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " Guarino, 980 F.2d at 405 (quoting InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir.1990).

## III. DISCUSSION

### A. Defendants' Motion For Summary Judgment (doc. 18)

#### 1. Introduction

On May 1, 2001, Defendants filed their Motion for Summary Judgment, and now

move this Court for a finding of summary judgment against Plaintiff's claim for an Order of Restitution in regard to the $30.00 in cash currency that was taken during his arrest, as well as Plaintiff's attempt to get the Pay–for–Stay Program, Book–in–Fee, and Ohio Revised Section § 341.06, as applied, to be declared unconstitutional by this Court (doc. 18). Defendants also assert that they are not liable for Plaintiff's claims due to the defenses of qualified immunity and Eleventh Amendment Immunity (*Id.*).

The Parties to this case have informed the Court that their research indicates that the issue of a county or sheriff's office promulgation and implementation of a state's prisoner reimbursement policy in regard to the pre-hearing attachment by a governmental body of cash brought in the jailhouse by pretrial detainees, may well be a case of first impression in this Circuit as well as a case of first impression in any other federal court as well. The Court notes that we too have not found any authority on point which deals directly with the due process implications of a pre-hearing attachment by a governmental body of cash brought in the jailhouse in relation to pretrial detainees.

## 2. *Defendants' Arguments*

Defendants' arguments can be summarized as follows (doc. 18). First, Defendants assert that Plaintiff has failed to state a claim for which relief could be granted under 42 U.S.C. § 1983 (doc. 18). *See* Fed.R.Civ.P. 12(b)(6). Specifically, Defendants assert that Plaintiff's failure to prove a constitutional violation, an essential element in a § 1983 action, renders all other "facts" immaterial. Defendants argue that, since Plaintiff did not and cannot establish that he suffered a constitutional deprivation, his § 1983 action must be dismissed and summary judgment must be granted in favor of Defendants.

Second, Defendants allege that there has been no deprivation of property whatsoever in this case, and certainly no deprivation of property without due process of law. Specifically, Defendants allege that there has not been a constitutional "taking" in violation of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. Furthermore, Defendants argue that, even if there was a constitutional taking, there has been no deprivation of property without due process of law, and, therefore, summary judgment must be granted in favor of Defendants.

Third, Defendants contend that they are entitled to qualified immunity. Specifically, Defendants contend that, given the state of the evidence in this case and the state of the relevant statutory interpretation and case law from 1996 to the present, Defendants are entitled to qualified immunity from suit as to Plaintiff's individual § 1983 claim against the County Defendants.

Fourth, Defendants maintain that they are also entitled to Eleventh Amendment Immunity. Specifically, Defendants maintain that, under the circumstances of this case, Defendants are considered to be state actors for liability purposes under 42 U.S.C. § 1983, and are, therefore, entitled to immunity from liability for damages under the Eleventh Amendment.

Finally, Defendants request that, if this Court questions the constitutionality of the Hamilton County Pay–for–Stay Program or Ohio Revised Code § 341.06, then Defendants move that this Court abstain from deciding that issue and certify the question to the Ohio state courts for their interpretation of this state statute, as well as Defendants' application of that statute.

## 3. *Plaintiff's Arguments*

Plaintiff filed his Response on May 7, 2001 asserting several reasons as to why

this Court should rule in his favor in regard to the proposed Order of Restitution for the confiscated $30.00 in cash, as well as Plaintiff's request for this Court to find, as a matter of law, that the Hamilton County Sheriff's Office Pay-for Stay Program is unconstitutional, as applied (doc. 19).

First, Plaintiffs assert that federal abstention is inappropriate under the circumstances of this case. Specifically, Plaintiff argues that there is simply no way an Ohio court will ever have an opportunity to pass on the constitutionality of Defendants' policy, since neither Plaintiff nor any of the class members had or would ever have the time to appeal in state court, between the confiscation of their funds and their release from jail, without having been charged or found guilty in order to meet the jurisdictional requirements that are necessary to go through the prison grievance system in order to reach the Ohio state courts.

According to Plaintiff, Defendants have admitted that, if the former detainees are lucky enough to receive a receipt and have the time and competence to follow the instructions on it, the former detainees would have to wait several weeks before receiving their expected refunds in the mail. Therefore, Plaintiff argues that a state court lawsuit concerning the constitutionality of the seizure of funds is unlikely, if not impossible, and Defendants have not pointed out any authority to the contrary.

Second, Plaintiff contends that there has been a constitutional "taking" by Defendants in this case of his $30.00 Book–in–Fee. In fact, Plaintiff contends that Defendants have already admitted that they "*separated $30.00 from Plaintiff's property* on July 18, 1999, and that the prisoner's cash that is applied to the Book–in–Fee is kept in a separate envelope ..., deposited with the county treasurer, and applied as reimbursement for the cost of the prison-

er's confinement" (*see* doc. 15) (emphasis added). Plaintiff argues that Defendants have failed to explain how this is not a constitutional "taking" of property.

Third, Plaintiffs maintain that the Ohio Legislature has granted all prisoner's the right to a hearing in front of a judge before that person is required to reimburse the incarcerating authority for any costs of confinement. *See* Ohio Rev.Code §§ 341.14 & 341.19. According to Plaintiff, § 341.06 neither requires nor authorizes Defendants to seize and attach an amount equal to the Book–in–Fee, or any other cost of incarceration, prior to a notice and a hearing.

Moreover, Plaintiff maintains that Defendants' position ignores the mandates of the Ohio Legislature as set forth in two other statutory provisions, one for felonies and one for misdemeanors, each of which expressly requires a hearing before any order of reimbursement is made (*Id.*).

For example, Ohio Revised Code § 2929.223(A)-(B) provides for reimbursement of costs for felonies, while a similar provision is applicable for those prisoners who are convicted of a felony are found in Ohio Revised Code § 2929.18(A)(4)(b)(i). These statutes require reimbursement of a county "for its expenses incurred by reasons of the prisoner's confinement" to be imposed by a court of law, and not by a county government or sheriff's office (*Id.*).

Fourth, Plaintiff asserts that, even without a state created property interest, due process is violated by a pre-hearing attachment of funds in these circumstances. Specifically, Plaintiff argues that the County Defendants would have this Court believe "it is playing fair" by requiring a released and innocent former detainee to return downtown to the courthouse with the proper paperwork to obtain his or her own money, taken out of his or her pocket and averaging $9.35 per taking.

Therefore, Plaintiff argues that the only rational way to comport with due process in the situation before this Court is for Defendants to refrain from its allegedly "unconstitutional pre-hearing attachments" and to follow the Ohio statutory provisions, which require a hearing before a judge in order to determine whether or when reimbursement should occur, as well as the amount of such reimbursement. *See* Ohio Rev.Code §§ 2929.223 & 2921.18. Plaintiff maintains that this will eliminate the persistent unconstitutional taking of money from innocent persons, a result that allegedly far outweighs the few dollars Defendants would lose if they are prohibited from "separating" cash from its "innocent-until-proven guilty" pretrial detainee jail population.

Fifth, Plaintiff contends that qualified immunity is inappropriate where, as here, no civil damages are sought and a state statute grants an express right to a hearing. Specifically, Plaintiff argues that the County Defendants knew, as does everyone else, that the unconstitutional taking of private property, by the very words of the Fourteenth Amendment, is not to be accomplished by the State without giving the process that is constitutionally due. Therefore, Plaintiff contends that since Defendants have given no due process whatsoever in this case, Defendants cannot now hide behind a shield of ignorance, in the form of qualified immunity.

Sixth, Plaintiff maintains that Eleventh Amendment Immunity is not applicable when the State Treasury is not implicated and when the county officials involved are not acting on behalf of the State. Specifically, Plaintiff maintains that any money recovered by Plaintiff would come from the Hamilton County Treasury, and not the Treasury of the State of Ohio, since it is the County's expenses which are being reimbursed.

According to Plaintiff, not only were these Defendants not agents of the State in setting up and enforcing their allegedly unconstitutional policy, they were also acting contrary to avowed State policy. Therefore, Plaintiff concludes his arguments by asserting that the Eleventh Amendment cannot insulate their actions in these circumstances.

**4.** ***The Intervenor's Arguments (doc. 22)***

On May 23, 2001, the Intervenor Attorney General filed a Post–Hearing Brief in Regard to Defendants' Motion for Summary Judgment in which she asserts three arguments in support of the facial constitutionality of Ohio Revised Code § 341.06 only (doc. 22).

First, the Intervenor asserts that Plaintiff lacks standing to challenge § 341.06 since he cannot put forth sufficient facts to establish that § 341.06 will harm him in any way in the future. However, the Court notes that the Intervenor does not address the issue of whether that harm is likely to be repeated again and again in the future against other potential plaintiffs.

Second, the Intervenor contends that, even if we find that Hamilton County and the Sheriff's Office acted unconstitutionally in promulgating and formulating their Pay–for–Stay Program, we should, nonetheless, abstain from ruling on any facial challenge to § 341.06, and/or instead, certify this issue to the Ohio Supreme Court for its review of a state statute. However, the Court notes that the Intervenor does not take any position in regard to supporting or challenging the County Defendants' application of § 341.06 in this case.

Third, the Intervenor argues that § 341.06 on its face does not violate the Due Process Clause to the Constitution. However, the Court also notes that all of

the arguments and cases the Intervenor puts forth in support of this contention do not address the specific issue of pretrial detainees who are deprived of a property right by a countywide policy and are not given notice and an opportunity to be heard. The arguments and cases put forth in the Intervenor's Brief all dealt with convicted prisoners, who presumably already had notice and a hearing before any deprivation took place by the governmental defendants.

### B. *The Court's Analyses*

### 1. *Introduction to the Parties' Claims and Defenses*

This is an action brought, pursuant to 42 U.S.C. § 1983, challenging the constitutionality of Ohio Revised Code § 341.06, as applied by the County Defendants in this case.

In the case at bar, there are essentially six issues that are before this Court: (1) Whether, pursuant to Rule 56 of the Federal Rules of Civil Procedure, there exist any genuine issues of material fact that would preclude this Court from rendering a final judgment in this case? (2) If not, are Defendants entitled to judgment in their favor as a matter of law? (3) Is Ohio Revised Code § 341.06 being applied in an unconstitutional manner by the Hamilton County Sheriff's Office and the Board of County Commissioners? (4) If so, what is the appropriate remedy or should this Court abstain from rendering a decision in this matter, and, instead, certify this issue to the Ohio Supreme Court? (5) Is Ohio Revised Code § 341.06 unconstitutional on its face? (6) If so, what is the remedy or should this Court abstain and certify this issue?

Having reviewed this matter, the Court makes the following preliminary findings in regard to the questions presented to us. First, there do exist several genuine issues of material fact that have not been an-swered by the Parties in their respective memoranda of law, as well as during the May 10th Hearing, which prevent this Court from making a conclusive finding in favor of one Party or the other.

Second, having found that there exist several issues of material fact, we also must find that, at this stage of the litigation, Defendants are not entitled to judgment in their favor as a matter of law.

Third, the Court makes a preliminary finding that the Hamilton County Sheriff's Office Pay–for–Stay Program may be unconstitutional as it is now applied and implemented, in general, as well as possibly unconstitutional as it was specifically applied in the case of Plaintiff Anthony Allen. However, this Court also finds that because there exist genuine issues of material facts at this stage of the litigation, it would be premature to make a final holding as to unconstitutionality of the Hamilton County Pay–for–Stay Program as a matter of law.

Fourth, the Court also makes a preliminary finding that Ohio Revised Code § 341.06 may be unconstitutional as applied and on its face as well, but the Court will reserve final judgment as to the appropriate remedies in this case and the issue of abstaining in favor of a state court's interpretation at this time. The reasons for the Court's findings will be explained more fully in the following sections.

Finally, we also find that "the distinction between convicted prisoners and pretrial detainees bears greatly on the assessment of the constitutionality of the conditions of incarceration." *Cudnik v. Kreiger,* 392 F.Supp. 305, 310 (N.D.Ohio 1974) (holding that the refusal by defendants to permit pretrial detainees, who were undergoing methadone treatment for drug addiction prior to their detention the right to continue methadone treatment during pretrial detention, denied those detainees due pro-

cess). Therefore, we do not find prisoner reimbursement policy cases that do not apply to pretrial detainees particularly helpful in our analysis of Plaintiff's allegations of property deprivation without a predeprivation notice and a hearing by the County Defendants.

Here, the class which Plaintiff wishes to represent consists only of pretrial detainees who are, as a fundamental constitutional tenet, presumed innocent of any wrongdoing. *See Cudnik*, 392 F.Supp. at 310 (citing *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Therefore, any constitutional "taking" by Defendants must adhere to the constitutional prerequisite of notice and an opportunity to be heard or a voluntary and informed waiver. However, if a *negligent, reckless, or intentional taking* takes place by an agent of Defendants, then and only then, is an adequate post-deprivation remedy constitutionally acceptable in this case. *See Parratt v. Taylor*, 451 U.S. 527, 537–38, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ("This Court has never directly addressed the question of what process is due a person ... when an employee of the State *negligently takes [a plaintiff's] property* .... [In all prior cases,] the deprivation of property was authorized by an established state procedure and due process was held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur.") (emphasis added).[2]

## 2. *Count I of the Complaint.*

### a. The County Defendants' Liability

■ In the case at bar, Plaintiff has sued all of the County Defendants in their official capacity (*see* doc. 1). Unlike States, municipal corporations and local governments are "persons" within the meaning of 42 U.S.C. § 1983, and are not, therefore, wholly immune from suit. *See Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental entity may not be held liable under § 1983 for an employee's conduct on the basis of *respondeat superior. Monell*, 436 U.S. at 691, 98 S.Ct. 2018. Rather, plaintiffs must show that the government entity itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

■ In essence, "[o]fficial capacity suits ... represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. at 165, 105 S.Ct. 3099 (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir.1994). Specifically, a section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Accordingly, for the purposes of the official capacity claims herein, Hamilton County is the only true Defendant at issue in this case.

In contrast, "personal-capacity suits" seek to impose personal liability upon a government official for actions the official takes under color of state law. *See Scheuer v. Rhodes*, 416 U.S. 232, 237–38,

---

2. *Daniels* overruled *Parratt* only to the extent that the earlier case held that a mere lack of due care may deprive an individual of "life, liberty, or property under the Fourteenth Amendment." *Daniels*, 474 U.S. at 330–31, 106 S.Ct. 662.

94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In the case at bar, only the Board of County Commissioners are sued in their respective individual capacities (*see* doc. 1). However, during the Hearing, Counsel for Plaintiff advised the Court that Plaintiff was no longer seeking compensatory and punitive damages against any of the listed County Defendants in this case. Therefore, this appears to be a moot issue at this point of the litigation, but, nonetheless, we will proceed to address the merits of this issue.

As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than the name, to be treated as a suit against the entity. *Brandon v. Holt,* 469 U.S. 464, 471–472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Graham,* 473 U.S. at 166, 105 S.Ct. 3099.

The Court views Plaintiff's sole claim as an action against the County Defendants, who are the official and duly elected agents of Hamilton County, Ohio. Plaintiff's Counsel informed the Court during the Hearing and in his Response that Plaintiff was now only seeking a Declaratory Judgment Order and Order of Restitution in this case.

Specifically, Plaintiff asks this Court to declare the Hamilton County Pay–for–Stay Program unconstitutional, move for the Court to order the County Defendants to return Plaintiff's $30.00 Book–in–Fee, and certify a class action for all other similarly situated plaintiff's who were directly affected by this allegedly unconstitutional Program.

**b. Title 42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.; see also Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 402–403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

To establish a claim under § 1983, two elements are required: (1) conduct committed by a person acting under the color of state law that (2) deprives plaintiffs of the rights, privileges, or immunities that are secured by the United States Constitution or the laws of the United States. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sargi v. Kent City Board of Educ.,* 70 F.3d 907, 910 (6th Cir.1995).

The Parties to this action do not dispute the fact that the County Defendants were acting under the "color of state law" when promulgating and implementing the Pay–for–Stay Program, as well as when the HCJC, under the direction of the Sheriff's Office, removed the $30.00 in cash from Plaintiff's person during his July 18, 1999 arrest in Cincinnati, Ohio. The only question remaining under § 1983 is, "Did Defendants also deprive Plaintiff of certain rights, privileges, or immunities secured by the Constitution or the laws of the United States?"

The Parties to this action do not dispute the fact that the Book–in–Fee was derived from the Pay–for–Stay Program that was promulgated and implemented by the County Defendants.

### 3. *Qualified Immunity*

█ Qualified immunity protects an official from liability only in his personal capacity. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). In the Complaint, Plaintiff asserted a federal civil rights claim against the Board of Commissioners in both their individual and official capacities (doc. 1). However, even if a plaintiff only prevails against an official in his official capacity, individual liability may not be imposed on the named official. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In the case at bar, the County Defendants have moved for summary judgment on the ground that they are immune from individual liability under 42 U.S.C. § 1983 (doc. 18) due to the doctrine of qualified immunity.

The Court notes that § 341.06, the "Prisoner Reimbursement Policy," was enacted by the Ohio Legislature in 1996. It is undisputed that the County Defendants promulgated and implemented the Pay–for–Stay Program in response to that statute on December 3, 1998 (doc. 18, Ex. A). In addition, on March 16, 1999, the Attorney General's Office drafted and distributed an official Opinion Letter # 99–021 supporting the Erie County, Ohio version of the Prisoner Reimbursement Program (*Id.*, Ex. B).

Furthermore, all of the Parties to this litigation assert that this is possibly a case of first impression in the nation in regard to deciding the constitutionality of a Prisoner Reimbursement Program that is applied to a pretrial detainee, without an opportunity for notice and a hearing. In fact, every other case that this Court has

reviewed on this subject involves convicted prisoners, parolees, or probation offenders who have already had a measure of due process before the taking, seizure, or attachment of funds was allowed to take place. *See Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410, 422–24 (3d Cir.2000) (holding that a fee of approximately $4,000.00 imposed on an inmate for housing costs incurred at a Pennsylvania state prison did not deny the inmate due process or deprive him of equal protection).

█ In addition, in his Complaint, Plaintiff has not made any allegations of bad faith or malice in regards to the actions of the County Defendants in promulgating and implementing the Pay–for–Stay Program. Therefore, the Court cannot find that the County Defendants' promulgation and implementation of the Pay–for–Stay Program violated clearly established statutory or constitutional rights of which a reasonable person would have known would be invalid or unconstitutional.

█ Whether or not qualified immunity exists in a given case is a legal question for the court, unless there is a genuine issue of material fact regarding whether the defendant actually committed the acts that would violate a clearly established right. *See Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997). The plaintiff bears the ultimate burden of proof to establish that the defendant is not entitled to qualified immunity. *See Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). Plaintiff has not met his burden in this case for another reason as well.

As stated earlier, Plaintiff's Counsel has asserted that Plaintiff is no longer seeking compensatory and punitive damages in this case. Therefore, we must assume that the named County Defendants are being sued in their official capacity only in order to seek an Order of Restitution and a Declar-

atory Judgment finding that the Hamilton County Pay–for–Stay Program and the Book–in–Fee are unconstitutional.

Accordingly, Defendants' Motion for Summary Judgment in regard to the defense of qualified immunity is hereby GRANTED (doc. 18).

### 4. *Eleventh Amendment Immunity*

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State.

U.S. Const. amend. XI.

"Although by its terms, the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 961–62, 148 L.Ed.2d 866 (2001); *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 669–70, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 121 S.Ct. at 962; *see also Kimel*, 528 U.S. at 73, 120 S.Ct. 631. The Court takes note of the fact that the State of Ohio is not listed in the Complaint as a named-Defendant in this case (*see* doc. 1)

A few years ago, the Supreme Court revisited its method for determining whether the Eleventh Amendment bars actions against certain entities of the State. In *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Court considered whether the Eleventh Amendment prevented an action under the Federal Employers' Liability Act against the Port Authority of New York and New Jersey. The facts differed considerably from the case at bar, but the legal rule applies here, nonetheless.

Justice Ginsberg, writing for the Court, emphasized one core issue: "Will a State pay if the defendant loses?" *See Hess*, 513 U.S. at 48, 115 S.Ct. at 394 ("Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations."). In the case at bar, this Court finds the Sixth Circuit Court of Appeals case of *Brotherton v. Cleveland*, 173 F.3d 552, 560 (1999) to be instructive and helpful in relation to the facts before us.

In *Brotherton*, a man's family alleged that there was a violation of their due process rights because the man's corneas were removed by the county coroner without the man's consent, or without the consent of the decedent's surviving next of kin. *Id.*, 173 F.3d at 558. Specifically, in *Brotherton*, Dr. Cleveland, the Hamilton County Coroner, removed the corneas from dead bodies pursuant to an internal policy and procedure by the Coroner's Office to remain deliberately ignorant of the wishes of the deceased's next of kin. *Id.* This policy was derived from an interpretation of Ohio law. *Id.* The Sixth Circuit ultimately held that the county coroner was not a state actor, but a county actor, and, therefore, he and the county defendant were not entitled to Eleventh Amendment Immunity. *Brotherton*, 173 F.3d at 561–62.

In the case at bar, whether we view as dispositive *Hess*'s emphasis on the state treasury, or interpret it as placing significant weight on one factor of a multi-factor test, *see, e.g., Harter v. Vernon,* 101 F.3d 334, 338 (4th Cir.1996), we conclude that the County Defendants may not properly invoke the Eleventh Amendment. *See Brotherton,* 173 F.3d at 561–62 (affirming the Order of this District Court that the Eleventh Amendment does not bar Plaintiff Brotherton's claims against the Defendant eye bank association, and concluding that the county coroner, Dr. Cleveland, acted as a county, and not a state official).

■ The rationale of *Hess* suggests that the Eleventh Amendment does not bar this action as well; because Hamilton County—rather than the State of Ohio—would satisfy any money judgment against the Sheriff and the Commissioners, therefore, this case also does not implicate the Eleventh Amendment. *See Hess,* 513 U.S. at 50, 115 S.Ct. 394; *see also Brotherton,* 173 F.3d at 563. The factors in the multi-part tests, whether modified or supplanted by *Hess,* point to a similar result.

Each factor militates against the County Defendants, who are duly elected county officials, who act autonomously with no State oversight, funded by Hamilton County, which presumably will bear financial responsibility for the judgment, and defended by attorneys from the County, and not from the State. *See Brotherton,* 173 F.3d at 563.

In particular, we find that Ohio law may have permitted Sheriff Leis to receive reimbursement for incarceration expenses from the prisoners in his care, however, it did not prescribe a specific policy as to how, when, or how much to charge those incarcerated with such expenses.

In fact, Judge Easterbrook of the Seventh Circuit held that, where Illinois law afforded discretion to a county official charged with enforcing its commands, the defendant acted as a county, not a state, official, and thus, could not invoke the protection Eleventh Amendment. *See Ruehman v. Sheahan,* 34 F.3d 525, 529 (7th Cir.1994); *see also Brotherton,* 173 F.3d at 565.

We find that the Seventh Circuit case of *Ruehman* comports with the Sixth Circuit case of *Brotherton* and several other similar decisions regarding county officials sued under § 1983. *Id.,* 173 F.3d at 567 (holding that the county coroner was not entitled to Eleventh Amendment Immunity because he was not an agent of the State).

■ Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State. *See, e.g., Bethesda Lutheran Homes and Servs., Inc. v. Leean,* 154 F.3d 716, 718 (7th Cir.1998) ("When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."); *Scott v. O'Grady,* 975 F.2d 366, 371 (7th Cir.1992) (holding that the county official acted as an arm of the State where the official merely executed a writ pursuant to his non-discretionary duty); *Echols v. Parker,* 909 F.2d 795, 801 (5th Cir.1990) (finding that local officials acted as State agents when they enforced a State anti-boycott statute by prosecuting boycotters).

In contrast, this case implicates Sheriff Leis and the Commissioners in their official policymaking capacity. *See Brotherton,* 173 F.3d at 566. Rather than merely enforcing prescribed Ohio law, the County Defendants voluntarily implemented a Pay–for–Stay Program and they chose the means of enforcing this Program using the Book–in–Fee guidelines. *Id.*

The essential question we must ask is, "Whether the County Defendants could

have chosen not to use their authority under the State statute and how much discretion they had in using such State-sponsored authority?" According to the Intervenor, the County Defendants were not mandated to implement § 341.06 and the statute was considered permissive in its application. Therefore, it appears that the County Defendants acted as agents for the County and not for the State of Ohio.

If the County Defendants could have opted to act differently, or not to act, they did not act as an arm of Ohio when the Defendants formulated and implemented the Hamilton County Pay–for–Stay Program. "This distinction reconciles *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir.1993) and *Pusey v. City of Youngstown*, 11 F.3d 652 (6th Cir.1993), and accords with *Ruehamn* and other views." *Brotherton*, 173 F.3d at 566.

Ohio law *allowed* the County Defendants to implement a prisoner reimbursement policy in the course of their actions as agents of Hamilton County, but it did not dictate a method. Sheriff Leis, acting without state compulsion, chose to implement this state statute using the Pay–for–Stay Program with the active involvement, participation, or acquiescence of the Hamilton County Board of Commissioners. Therefore, all of the named Defendants acted as agents of Hamilton County, not of the State of Ohio.

Accordingly, the Eleventh Amendment does not prevent this Court from exercising jurisdiction over Plaintiff's claims against all of the County Defendants in their official capacities as the Sheriff and Commissioners of Hamilton County. *See Brotherton*, 173 F.3d at 567.

In addition, since Plaintiff has conceded the fact that he is no longer seeking compensatory or punitive damages, the State's fisc or tax dollars are not at stake. Plaintiff only wants an Order of Restitution seeking the return of his $30.00 Book–in–Fee. At this point of the litigation, Plaintiff is only asking for his money back and possibly those funds taken from other similarly situated plaintiffs. Such an Order of Restitution should only impinge the County's general operating fund and not that of the State of Ohio in returning Plaintiff's funds, and not the taxpayers of Ohio or of Hamilton County.

Furthermore, Hamilton County cannot be said to be prejudiced by a denial of Eleventh Amendment Immunity, since Plaintiff is only asking for the return of his funds, which Defendants have already stated that Plaintiff is entitled to receive as soon as he is willing to apply for a refund. Therefore, this Court hereby DENIES Defendants' Motion for Summary Judgment in regard to Defendants' assertion of Eleventh Amendment Immunity (doc. 18).

## IV. THE COURT'S CONSTITUTIONAL REVIEW

### A. Introduction

■ The United States Supreme Court has rejected the view that the applicability of one constitutional Amendment preempts the guarantees of another. As explained in *Soldal v. Cook County*, 506 U.S. 56, 70, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992):

> Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's dominant character. Rather, we examine each constitutional provision in turn.

*Soldal*, 506 U.S. at 70, 113 S.Ct. 538. Here, as in *Soldal*, the seizure of property implicates two, "explicit textual source[s] of constitutional protection," the Fourth Amendment and the Fifth Amendment, as

applied to the States through the Fourteenth Amendment.

The proper question is not which Amendment controls but whether any of the Constitutional Amendments are violated. "So even assuming that the Fourth Amendment was satisfied in this case, it remains for us to determine whether the seizure complied with our well-settled jurisprudence under the Due Process Clause." *United States v. James Daniel Good Real Property,* 510 U.S. 43, 52, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).

In the following sections, this Court will address several of the potential constitutional problems that now exist in regard to Defendants' Pay–for–Stay Program and which prevents this Court finding in favor of Defendants as a matter of law.

**B.** *The Fourteenth Amendment*

**1.** *Pretrial Detainees*

 "The Eighth Amendment standards which prohibit cruel and unusual treatment of prisoners have doubtful applicability to pretrial detainees, for the state may subject an individual to punishment only after conviction of a crime." *Cudnik v. Kreiger,* 392 F.Supp. 305, 310–11 (N.D.Ohio 1974) (Battisti, C.J.) (citing *Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.1973)); *see also Rhem v. Malcolm,* 371 F.Supp. 594, 623–24 (S.D.N.Y.1974). "Since an unconvicted individual may not be punished by the state, it follows that a proper analytical framework for the assessment of conditions of pretrial detention is the due process clause." *Cudnik,* 392 F.Supp. at 311. In the case at bar, it is undisputed by either Party to this action that, from the day of his arrest on July 18, 1999, until the day his charges were dismissed, Plaintiff Anthony Allen was a pretrial detainee at the HCJC.

"Given this permissible deprivation of liberty, due process and its concept of fairness dictates that a pretrial detainee should not be subjected to additional punishment or loss, unless such further deprivation receives justification from a valid interest of the state." *Id.* As aptly stated in *Hamilton v. Love,* 328 F.Supp. 1182, 1193 (E.D.Ark.1971):

> If the conditions of pretrial detention derive from punishment rationales, such as retribution, deterrence, or even involuntary rehabilitation, then those conditions are suspect constitutionally and must fall unless also clearly justified by the limited ... purpose and objective of pretrial detention....

*Hamilton,* 328 F.Supp. at 1193. Defendants counter that the Book–in–Fee was not a form of pre-conviction punishment, but merely a method of reimbursement from pretrial detainees for the costs of their booking and processing fees, instead of burdening the taxpayers of Hamilton County for such costs.

Some past cases have held that pretrial confinement must be consistent with the least restrictive means available to achieve this valid governmental objective. *See Cudnik,* 392 F.Supp. at 312 (holding that the jail policy of denying methadone to pretrial detainees, does not effectuate the state's narrow interests in pretrial confinement, and, therefore, this policy "constitutes punishment imposed without a finding of criminal culpability and, as such, is violative of fundamental due process rights"); *Hamilton,* 328 F.Supp. at 1192 (holding that, "[i]t is manifestly obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty").

In the case at bar, Defendants have not submitted any evidence tending to prove that their Pay–for–Stay Program is the least restrictive means of achieving and implementing a prisoner reimbursement

policy. There just is not enough evidence in order to make a finding of that kind at this point in the litigation in favor of Defendants

### 2. *The Procedural Due Process Clause*

### a. Notice and a Hearing

The Fourteenth Amendment guarantees that in all cases where an individual stands to be deprived of life, liberty or property by the government, he is entitled to due process of law. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citing *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

Referred to as procedural due process, the Supreme Court has generally held that this aspect of the Fourteenth Amendment requires the State to provide individuals with notice and an opportunity to be heard before the State effects a deprivation. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 51, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

 In the case at bar, .Defendants defend their actions by asserting that Plaintiff was not constitutionally deprived of his $30.00, so, therefore, he was not entitled to notice or a predeprivation hearing. The Court makes a preliminary finding that Defendants may have violated Plaintiff's property rights under the Procedural Due Process Clause of the Fourteenth Amendment. The Due Process Clause is very clear in that Plaintiff cannot be deprived of his property without a notice and right to be heard. While it is true that there are several stated exceptions to this express right, Defendants have not proven as a matter of law, that any of those exceptions would apply here.

First, Defendants admit that every pretrial detainee is forced to pay the Book–in–Fee with whatever amount of funds that detainee may have on his or her person, up to the $30.00 limit. It does not matter what crime the detainee may or may not have committed. It does not matter that the funds in the possession of the detainee may not have been linked to the crime charged or were considered to be the fruits of that crime. It does not matter whether that detainee is actually innocent of his or her charges, first time arrested, or a multiple felon. After reading Defendants' brief and listening to their oral arguments at the Hearing, Defendants have not put forth any case law, statute, or Constitutional provision which would allow a governmental entity this kind of unmitigated discretion, power, or right to a citizen's property.

Second, Defendants assert that it would be impracticable, unrealistic, and considered to be an undue burden on the County to provide every pretrial detainee notice and a hearing before confiscating their funds for the Book–in–Fee. The Court answers this defense by simply stating that, if the County Defendants are unwilling or unable to offer every pretrial detainee their due process rights before charging them with the $30.00 booking fee, then the County Defendants should wait until a conviction or a plea of guilty is entered before assessing the Book–in–Fee.

Third, this Court fully recognizes that there are exceptions to the normal right to have notice and a hearing before one is deprived of his or her property rights by a governmental entity. But these cases normally involve fungible property that may be the product of the illegal activity. In addition, such cases are usually set forth in examples in which extraordinary or exigent circumstances exist that require the government to immediately confiscate the

"fruits of a crime," or the evidence of a crime immediately, or else lose it forever. *Board of Governors of Federal Reserve Sys. v. DLG Fin. Corp.*, 29 F.3d 993, 1001 (5th Cir.1994) (finding that the freezing of assets as provided in 12 U.S.C. § 1818(i)(4) is an extraordinary situation not requiring predeprivation notice and hearing).

The only argument of this sort offered by Defendants is that, if the County does not take the $30.00 Booking Fee immediately upon arrest, the pretrial detainees will either spend it, or transfer it to another person, or in some way make it unavailable to the County Defendants if and when that detainee is found guilty or enters a plea of guilty. The Court finds this argument to be meritless. It does not matter how fungible a pretrial detainee's funds are or what he or she may decide to do with them prior to his or her conviction or plea, if Defendants have no constitutional right to confiscate that detainee's funds prior to providing the detainee notice and a right to be heard in the first place.

In other words, unless the County Defendants can prove that those funds are evidence of a crime, or the fruits of a crime, or that there are extraordinary or exigent circumstances which exist, the pretrial detainees are entitled to notice and a hearing before seizure. Therefore, we are unable to conclude at this point in the litigation that Defendants are entitled to judgment in their favor as a matter of law.

**b.** *Parratt v. Taylor*

In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court held that where there has been an **unauthorized or negligent** deprivation of property without due process, a plaintiff bringing a section 1983 claim must allege that the state's post-deprivation proce-

dures are inadequate to remedy the deprivation. *Id.* (emphasis added); *see also Hudson v. Palmer*, 468 U.S. 517, 531, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (holding that the *unauthorized intentional deprivation of property* by a state employee does not constitute a violation of the Due Process Clause if a meaningful post-deprivation remedy for the loss is available) (emphasis added).

This is now known as the "*Parratt* rule." *See Jackson v. City of Columbus*, 194 F.3d 737, 750 (6th Cir.1999).

Neither Party to this action have asserted that Plaintiff's $30.00 Book-in-Fee collection resulted from the negligent, reckless, or unauthorized actions by personnel at the HCJC. In fact, it remains undisputed that both Parties assert that the fee was taken pursuant to the Hamilton County Pay-for-Stay Program and those HCJC personnel charged with processing pretrial detainees were merely implementing those established policies and procedures as outlined by Defendants.

Where state actors are following established state procedures that result in the deprivation of an individual's property, the existence of post-deprivation remedies are ordinarily irrelevant and the requirements of prior notice and an opportunity to be heard apply. Although a post-deprivation hearing may be adequate where a predeprivation hearing is impossible or impracticable, or if there is a necessity for quick action. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Defendants contend that, if the Book-in-Fee was not retrieved upon the detainee's entry at the HCJC, such a highly fungible item as cash would not be retrievable later. In addition, Defendants argue that it is impracticable, impossible, and an undue burden for Defendants to attempt to give every pretrial detainee arrested in

a city the size of Cincinnati, notice and a hearing upon initial processing at the HCJC.

The Court makes a preliminary finding that the real issues we must answer are: (1) Should Plaintiff have been deprived of his $30.00 in cash by Defendants in the first place? (2) If so, why did he not get notice and a hearing prior to the taking? Defendants cannot assert the holding of *Parratt* concerning adequate post-deprivation remedies as a defense to their actions in this case, since *Parratt* only applies in the case of a negligent or unintentional taking that was not pursuant to an established governmental policy or procedure.

Therefore, Defendants have failed to make an adequate showing as to why Plaintiff was deprived of his property interest in his confiscated $30.00 in cash. In addition, Defendants have also failed to justify why Plaintiff was not given his due process rights in this instance prior to the taking of his Book–in–Fee.

Finally, if the Court would adopt the County Defendants' interpretation of the holding of *Parratt,* what would prevent Defendants from routinely depriving a pretrial detainee of all of the funds on his or her person without a predeprivation notice and hearing, so long as there was an adequate post-deprivation remedy. We do not find that the holding of *Parratt* would permit such a routine, policy-driven deprivation of a pretrial detainee, and, therefore, we cannot rule in favor of Defendants as a matter of law under the rule of *Parratt v. Taylor.*

### 3. *The Equal Protection Clause*

Equal protection of the laws is guaranteed by the Fourteenth Amendment to the United States Constitution, which provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.[3]

This, the Supreme Court has told us, "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).[4] "In other words, the government may not inappropriately classify people." *Arms v. Magaw,* 91 F.Supp.2d 1061, 1070 (E.D.Mich.2000). After all, equal protection principles function by "keep[ing] governmental decision makers from treating differently persons who are in all relevant respects alike." *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 531 (6th Cir.1998).

---

3. When appropriate circumstances allow it, some older court cases have employed the Equal Protection Clause in order to gauge the constitutionality of pretrial confinement. For example, in the case of *Brenneman v. Madigan,* 343 F.Supp. 128, 138 (N.D.Cal.1972), as an alternative to the due process holding, the court chose to compare the conditions of confinement for pretrial detainees to the conditions pertaining to convicted prisoners using an equal protection analysis. *See also Jones v. Wittenberg,* 28 Ohio Misc. 81, 323 F.Supp. 93, 100 (N.D.Ohio 1971).

4. The Ohio Supreme Court has stated that the "Equal Protection Clause of the United States Constitution, contained in the Fourteenth Amendment and the Equal Protection Clause of the Ohio Constitution, contained in Section 2, Article I, are functionally equivalent." *Mixon v. State of Ohio,* 193 F.3d 389, 402 n. 11 (6th Cir.1999) (quoting *Desenco, Inc. v. City of Akron,* 84 Ohio St.3d 535, 706 N.E.2d 323, 332 (1999)). We, thus, interpret the two Equal Protection Clauses together.

"A statute challenged on equal protection grounds will be subject to strict scrutiny when the statute involves a 'suspect' classification or has an impact on a 'fundamental' right." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir.1999); *see also Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("Classifications based on race or national origin and classifications affecting fundamental rights are given the most exacting scrutiny.").

In "[t]he intermediate level, heightened scrutiny, applies when a quasi-suspect classification is at issue." *International Ass'n of Firefighters Local 3858 v. City of Germantown*, 98 F.Supp.2d 939, 946 (E.D.Tenn.2000) (citing *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)).

"If the statute does not involve a suspect classification or affect a fundamental right, then it will be subject to rational basis review." *Lake Superior Chippewa Indians*, 172 F.3d at 410; *see also Heller v. Doe*, 509 U.S. 312, 319–320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.").

In the instant case, there is no dispute by the Parties that the appropriate level of scrutiny is the rational basis standard. Accordingly, because § 341.06 burdens neither a suspect class of persons nor a fundamental right, we also find that it is subject only to rational basis review.

Nevertheless, we preliminarily find that the Hamilton County Pay–for–Stay Program, as applied using the Book–in–Fee, may be unconstitutional under the Equal Protection Clause even when viewed using the rational basis test. Under this review, a law is valid if it "rationally furthers a legitimate [governmental] interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

This test would require this Court to reject a plaintiff's equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (internal quotations omitted). Although this is a deferential standard, it "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).

As the Supreme Court has consistently held, "arbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review." *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). Thus, a law will fail under rational basis review if " 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [legislature's] actions were irrational.' " *Gregory v. Ashcroft*, 501 U.S. 452, 471, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)); *accord City of Cleburne, Tex. v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (finding that a government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational").

"Further, the question is not whether there is a rational basis for a law in general; rather, the question is 'whether there is an appropriate governmental interest

suitably furthered by the differential treatment.'" *Walker*, 65 F.Supp.2d at 600 (quoting *Police Dep't v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)).

▮ In the case at bar, during the Hearing and in their Motion for Summary Judgment, Defendants' Counsel all but admitted that similarly situated persons are treated differently. For example, the evidence is undisputed that the average Book–in–Fee amount retrieved from pretrial detainees at the HCJC came to a little over $9.00 per person. Those detainees with $30.00 or more in currency in their pockets paid the full Book–in–Fee amount, while those detainees with $0–$29.99 in their pockets were required to surrender those funds on their person as part of the detainee's Book–in–Fee.

Defendants did not, however, inform the Court as to whether those detainees owing the remainder of the $30.00 Book–in–Fee were eventually ordered to pay by way of a lien, post-conviction assessment, or other debtor action the balance of what was due; or was the pursuit of the detainee's debit balance dropped by Defendants upon the detainee's release.

There also remains a question as to what type of currency was accepted as payment of the $30.00 Book–in–Fee during the pretrial detainee's initial processing. Did Defendants only take the cash currency, checks, credit cards, etc.; and if not, why not? In other words, were those pretrial detainees with cash currency on their persons treated differently than those detainees with checks and credit cards? If cash was preferable to Defendants, how did rejecting other forms of currency serve to promote their legitimate governmental interest? Furthermore, we also ask were all of the similarly situated persons who were subject to the Book–in–Fee treated the same or different depending on their form of currency, how readily accessible that currency was, did little or no currency on hand equate to no Book–in–Fee, were those Book–in–Fee debtors legally pursued for payments in full? If the answer is no, then we must ask Defendants why?

One can immediately see the inequity and potential unconstitutionality of the disparate treatment of two or more similarly situated persons being processed at the HCJC with a simple example.

Detainee A is a very wealthy individual, but on the very day he was arrested, he had little or no cash currency on his person. When processed at the HCJC, the $0–$5.00 in his pocket is ultimately accepted as "payment-in-full" for the Book–in–Fee, since no further debtor-creditor action is pursued against Detainee A by the County Defendants.

Detainee B is a poor individual, but on the very day he was arrested, he had $30.00 or more in cash in his pocket. When processed at the HCJC, the $30.00 in his pocket was taken by Defendants as "payment-in-full" for the Book–in–Fee.

Detainee C is a middle-class person, but on the very day he was arrested, he only had checks or credit cards in his pocket, and no cash currency. When processed at the HCJC, will those checks and credit cards be acceptable, same as cash, in lieu of the $30.00 Book–in–Fee. If accepted by the HCJC, what happens if the check or credit card amount is rejected due to insufficient funds, closed account, or over the purchase limit. Does the HCJC pursue the alleged debtor using the courts, file a post-judgment lien, or does the HCJC drop the matter, altogether?

One can see the possibility of how two or more similarly situated pretrial detainees can be treated very differently by the County Defendants, depending on what type of property one has in his or her

possession on the day one is arrested. This sort of different treatment depending on the currency a detainee has on his or her person when arrested may not be rationally related to serve a legitimate government interest.

Because, if the purpose of the Pay–for–Stay Program is to defray the costs of the pretrial detainee's confinement and that confinement is valued by the County Defendants to be $30.00, what difference would it make as to what type of or the amount of currency a detainee has on his or her person when processed at the HCJC. That would possibly fail the rational basis test. Therefore, we find that there are genuine issues of material fact and questions that this Court must receive answers to before we can make a final determination as to whether the Pay–for–Stay Program is unconstitutional, as applied in Hamilton County.

### C. *The Fourth Amendment*

### 1. *Introduction*

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, protects not only criminal suspects but also limits governmental intrusions in civil contexts. *Flatford v. City of Monroe*, 17 F.3d 162, 169 (6th Cir.1994). The text of the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. Const. amend. IV.

It is undisputed by the Parties to this action that, Defendants had no warrant or probable cause related to the $30.00 taken from Plaintiff during his arrest and pro-

cessing at the HCJC. Since there is no evidence in the record of Plaintiff's $30.00 being related to a crime, evidence of a crime, the fruits of a crime, or the subject of a warrant, probable cause or exigent circumstance exception, Defendants may have violated Plaintiff's Fourth Amendment rights when they confiscated his $30.00 at the HCJC.

The text of this Amendment directly applies to the factual circumstances in the instant case. The relevant portion of this Amendment protects property interests as well as expectations of privacy. *Armendariz v. Penman*, 75 F.3d 1311, 1320 (9th Cir.1996) (noting that the specific guarantees of the first Eight Amendments to the United States Constitution prescribe limits to the exercise of government authority in particular situations); *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) ("Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' ") (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

Defendants do not dispute the fact that Plaintiff had a property interest in the funds on his person at the time the Book–in–Fee was applied. Rather, Defendants contend that there was no deprivation of Plaintiff's property interest, and, therefore, no seizure, as long as they followed § 341.06 and provided an adequate post-deprivation procedures for the return of Plaintiff's funds.

### 2. *The County Defendants "Seized" Plaintiff's Funds.*

 A seizure of property occurs when there is some meaningful interference with

an individual's possessory interests in that property. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Indeed, the right against unreasonable seizure of property would be "no less transgressed if the seizure.... was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, or for no reason at all." *Soldal v. Cook County, Ill.,* 506 U.S. 56, 69, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).

Plaintiff has presented evidence that Defendants removed property belonging to him upon his arrest and processing at the HCJC. Assuming the allegations presented by Plaintiff are true, the Fourth Amendment provides an explicit textual source for the governmental conduct being challenged by Plaintiff. This Court, like the Supreme Court in *Graham* and *Albright,* finds this Amendment can act as a guide in our analyses of this case.

■ In order to state a claim under the Fourth Amendment, a plaintiff must, therefore, allege that: (1) a governmental defendant's actions constituted a search or seizure within the meaning of this Amendment; and (2) their actions were unreasonable in light of the surrounding circumstances. This Amendment protects property interests as well as expectations of privacy. *Soldal v. Cook County,* 506 U.S. 56, 62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *United States v. Jacobsen,* 466 U.S. 109, 120, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Therefore, Defendants' actions in this case can be viewed as a "seizure" of Plaintiff's funds under the right circumstances.

Looking initially to the plain meaning of the term, the Court notes that, as commonly defined, "seizure" does not encompass the concept of withholding property; rather, "it is generally defined as the confiscation or taking of property as opposed to the retention of an item."

*Fox v. Van Oosterum,* 987 F.Supp. 597, 608 (W.D.Mich.1997) (citing Black's Law Dictionary 1219 (5th ed.1979)). Plaintiff asserts that Defendants describe their actions toward Plaintiff's funds as a "separation" of funds and not as a taking, seizure, attachment or confiscation of those funds.

The Supreme Court has long held, however, that a more expansive definition is appropriate in the Fourth Amendment context. For Fourth Amendment purposes, a "'seizure of property ... occurs when there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal,* 506 U.S. at 61, 113 S.Ct. 538 (quoting *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652). Applying this broader definition, courts have held that the wrongful retention of property may state a claim under the Fourth Amendment. *See, e.g., Bush v. Banks,* Nos. 95–6370, 96–5015, 1996 WL 668551 (6th Cir. Nov. 18, 1996) (holding plaintiff, whose "property was retained by the county for an extensive period," had legally cognizable claims under both the Fourth and Fourteenth Amendments) (unpublished opinion); *Eaton v. Farmer,* No. 93–6305, 1994 WL 151336 (6th Cir. Apr. 26, 1994) (holding that the complaint alleging Fourth and Fourteenth Amendment violations based on the wrongful refusal to return property was not frivolous) (unpublished opinion).

■ This Court finds that, during the oral arguments presented at the Hearing and in his Response brief, Plaintiff's Counsel has presented sufficient and credible evidence that there may have been a constitutional "seizure" of Plaintiff's $30.00 by Defendants in furtherance of its Pay–for–Stay Program. Defendants may describe their actions toward Plaintiff's $30.00 in many terms, but it does appear that Plaintiff was dispossessed of his funds by De-

fendants, although, Defendants assert there was a signed Waiver in this case which allowed them to do so with Plaintiff's consent.

### 3. Defendants' "Seizure" May Have Been Unreasonable

Having demonstrated that Defendants' actions do implicate the Fourth Amendment, the only question remaining is whether Plaintiff has articulated sufficient facts to demonstrate a genuine issue of material fact in regard to the question of reasonableness. The Supreme Court has noted that there is a temporal element to this analysis. *See Hudson v. Palmer,* 468 U.S. 517, 538, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (citing *United States v. Place,* 462 U.S. 696, 709–710, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)); *Jacobsen,* 466 U.S. at 124–25, 104 S.Ct. 1652. Indeed, the Supreme Court has held that a seizure originally conducted lawfully can, nevertheless, become unlawful if the duration or manner of the seizure is deemed unreasonable in light of the competing interests. *Id.*

In the case at bar, Defendants' Counsel admitted at the Hearing that, once a plaintiff is adjudicated as not guilty or the charges are dismissed, it can take up to 4–6 weeks for that individual to get his or her cash refund returned to the detainee by check from the County Defendants and that refund will be without interest. In addition, Plaintiff has put forth evidence showing that some detainees who have requested their refund from the County Defendants have never received their funds, even after they applied with the HCJC for its return.

In fact, at the Hearing, Defendants' Counsel informed the Court that there was a total of approximately $400,000.00 in Book–in–Fee funds in the County's or Sheriff's general operating fund, but she had no idea at that time as to from where or when those monies were collected, what

percentage of money collected has been requested back, how many refunds have been attempted to be mailed, but failed, what happens to the detainee's funds when he or she fails to properly request a refund, what efforts are made on the part of Defendants to secure the detainees' refund.

All of these questions as of today, require an answer from the Parties before we can decide, as a matter of law, whether Defendants' actions in regard to the seizure of Plaintiff's funds were reasonable or unreasonable.

However, at this stage of the litigation, the Court preliminarily finds that the County Defendants have not presented sufficient justification as to why Plaintiff's $30.00 were seized in the first place, and certainly has not presented sufficient evidence as to the reasonableness of such a seizure. Therefore, we find that Defendants are not entitled to judgment as a matter of law on the issue of allegedly violating Plaintiff's Fourth Amendment rights.

Therefore, the question arises as to, "How does the issue of probable cause fit in Defendants' seizure of a pretrial detainee's Book–in–Fee?" It stands to reasons that just because the County Defendants may have had the probable cause to arrest, process and search Plaintiff in this case, does not explain or justify their need to deprive Plaintiff of his funds, which was not linked to the cause of the criminal charge, especially without a predeprivation notice and a hearing.

### D. Case of James Daniel Good Realty And The Matthews' Test

#### 1. United States v. James Daniel Good Realty

Plaintiff claims that Defendants violated his due process rights under the

Fifth Amendment, as applied to the States under the Fourteenth Amendment, by not providing a hearing, as required in *United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).

"First, we must determine in what circumstances *Good* requires predeprivation notice and a hearing and in what situations the government can act without this process." *United States v. Real Property Known And Numbered As 429 South Main Street, New Lexington, Ohio,* 52 F.3d 1416, 1419 (6th Cir.1995). Then we need to determine whether Plaintiff's forfeiture fits under the first category or the second. *429 South Main Street,* 52 F.3d at 1419. If we determine that he was entitled to notice and a hearing before forfeiture, we must then decide what remedy he should receive for this violation of his due process rights. *Id.*

 The principal question the Supreme Court asked in *Good* is very similar to the question we ask ourselves in the case at bar, "[W]hether, in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the Government in a civil forfeiture case from seizing real property without first affording the owner notice and an opportunity to be heard?" *Id.,* 114 S.Ct. at 497. We answer the same way that the Supreme Court answered this question in *Good*—this Court holds that it does. *Id.*

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person ... be deprived of life, liberty, or property, without due process of law." The general rule is that an individual should receive predeprivation notice and a hearing. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 500–501, 126 L.Ed.2d 490 (1993); *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (holding that the loss of kitchen appliances and household furniture

was significant enough to warrant a predeprivation hearing); *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 342, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It is undisputed in this case that, at a minimum, Plaintiff was "separated" from his $30.00 in cash currency by Defendants during his arrest and processing procedures at the HCJC, without notice or a hearing.

"The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property...." *Good,* 114 S.Ct. at 500–501 (quoting *Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)).

"Civil asset forfeiture has become an important law enforcement tool, not simply to remove from criminals the spoils of crime, but to supplement law enforcement budgets." *United States v. Real Property Known And Numbered As 429 South Main Street, New Lexington, Ohio,* 52 F.3d 1416, 1419 (6th Cir.1995); *see also United States v. All Funds on Deposit in any Accounts, Merrill Lynch,* 801 F.Supp. 984, 989 (E.D.N.Y.1992) ("As the 'drug war' has escalated, the number of forfeitures in the United States has [escalated as well]. Taking away the profits of drug crimes through forfeiture is a powerful weapon to cripple drug-trading enterprises. Unfairly wielded, it can place commercial enterprises at a terrible disadvantage.").

Justice Thomas suggested that it was the Supreme Court's "implicitly expressed distrust of the Government's aggressive use of broad civil forfeiture statutes" that motivated the Court's due process ruling

in *Good. Good,* 114 S.Ct. at 515 (Thomas, J., concurring in part and dissenting in part). It is also undisputed by the Parties to this action, that *each and every* pretrial detainee, regardless of the level of seriousness of his or her alleged criminal offense, is forced to pay the Book–in–Fee upon his or her arrival at the HCJC.

It appears that the Hamilton County Pay–for–Stay Program was not implemented as a public policy in order to solely combat the drug war or other serious societal ills, because this same $30.00 fee would be applicable to misdemeanor detainees, felony warrant detainees, traffic offense detainees, domestic relations detainees, capital murder detainees, and all other persons processed through the HCJC. Nevertheless, the *Good* Court recognized that not all forfeitures require a hearing. The Court noted that the forfeiture of a yacht could proceed without pre-deprivation notice and a hearing, because the "ease with which an owner could frustrate the Government's interests in the forfeitable property created a 'special need for prompt action' that justified the postponement of notice and a hearing until after the seizure." *Id.,* 114 S.Ct. at 500 (quoting *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)) (quoting *Fuentes,* 407 U.S. at 91, 92 S.Ct. 1983).

The *Good* Court cautioned that, "[w]e tolerate some exceptions to the general rule requiring deprivation notice and hearing, but only in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Id.,* 114 S.Ct. at 501 (quoting *Fuentes,* 407 U.S. at 82, 92 S.Ct. 1983) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)); *see also Board of Governors of Federal Reserve Sys. v. DLG Fin. Corp.,* 29 F.3d 993, 1001 (5th Cir.1994) (finding that the freezing of assets as pro-vided in 12 U.S.C. § 1818(i)(4) is an extraordinary situation not requiring predeprivation notice and hearing).

In the case at bar, Defendants argue that, if pretrial detainees were allowed the use of their money until after a conviction or plea of guilty was entered, those detainees may decide to spend the $30.00 in the HCJC Commissary or elsewhere, and, thus, such a fungible and readily convertible item, such as cash, must be confiscated at the earliest opportunity in order to be reimbursed for the HCJC's expenses in their processing and confinement. The Court does not find Defendants' arguments rise to the "extraordinary" circumstances as required by the Supreme Court, in such cases as a yacht bought by drug money that may not be available to be attached if law enforcement had to wait for notice and a hearing to be processed.

The Supreme Court in *Good* concluded that determining whether a particular seizure of property justifies an exception to the general rule of providing notice and a hearing requires "an examination of the competing interests at stake." The *Good* Court evaluated these competing interests by applying the three-part test as set forth in the case of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Good,* 114 S.Ct. at 501.

### 2. *Matthews v. Eldridge*

"The *Matthews'* test balances the private interest affected by the official action; the risk of error though the procedures used, as well as the probable value of additional or substitute procedural safeguards; and the Government's interest, including the fiscal and administrative burdens that additional procedural requirements would impose." *United States v. Real Property Known and Numbered as 429 South Main Street, New Lexington, Ohio,* 52 F.3d 1416, 1420 (6th Cir.1995)

(citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

In *Good,* the Supreme Court applied the *Matthews'* test to the forfeiture at issue, and found that the affected property interest in a person's home "weighs heavily in the *Matthews* balance." *Good,* 114 S.Ct. at 501. Furthermore, the Court found that the practice of *ex parte* seizure created "an unacceptable risk of error" with "little or no protection to the innocent owner," because the government, at the *ex parte* stage, need only show the needed probable cause in order to believe that the "property was 'used or intended to be used'" to commit a felony narcotics offense. *Id.,* 114 S.Ct. at 502 (quoting 21 U.S.C. § 881(a)(7)).

The *Good* Court noted that the protection of a predeprivation hearing was especially important in the asset forfeiture context, because "the Government has a direct pecuniary interest in the outcome of the proceedings." *Id.* The Court added that a post-deprivation hearing was not an adequate substitute, since with clogged civil dockets, a claimant might not receive his hearing for many months. *Id.*

Turning to the third *Matthews'* factor, the *Good* Court found that the need for prompt action was not present in real property forfeiture actions, "[b]ecause real property cannot abscond." *Id.* Furthermore, the Supreme Court added that the government can preserve the property while obtaining a forfeiture judgment using methods short of seizure, such as by filing a *lis pendens* or obtaining a restraining order. Therefore, the Court found that postponing seizure until after an adversarial hearing did not pose an undue burden on the government. *Good,* 114 S.Ct. at 504.

The *Good* Court concluded that the owner of the seized property should have received predeprivation notice and a hearing. The Court further noted that the burden would be on the government to demonstrate that there were exigent circumstances that would justify not providing the owner with notice and a hearing. *Id.,* 114 S.Ct. at 505; *see also 429 South Main,* 52 F.3d at 1420.

The issue before us is plain: If Plaintiff's $30.00 was "attached," does due process require that the County Defendants provide him with predeprivation notice and a hearing. Applying the *Matthews'* factors cited above, we must answer this question preliminarily in the affirmative. Let us look closely at facts of the case at bar.

Anthony Allen is a citizen of Ohio and of the United States. It is undisputed by any of the Parties that he has never been arrested before and had no connection to any illegal activity that would have generated the funds in his possession. It is also undisputed that Mr. Allen had a property interest in the $100.00 that was in his possession before he was arrested. In other words, Mr. Allen could have chosen to invest his cash in a for-profit venture, collected interest on those funds at his local bank, or chose to spend it or save it in any other fashion he chose.

On July 18, 1999, it is undisputed that Mr. Allen was arrested due to a computer error involving mistaken identity. It is also undisputed that Mr. Allen had a total of $100.00 in his possession at the time of his arrest and processing at the HCJC. It is further undisputed that the Sheriff's Office then proceeded to "separate" $30.00 from the $100.00 cash total. The $70.00 was placed in a separate and secured area along with any other personal items in Mr. Allen's possession. Thereafter, all of those personal items, including the $70.00 in cash, were immediately retrievable and accessible to Mr. Allen, or a designated person of his choosing, at the Property Window of the HCJC.

According to Defendants, Mr. Allen was then informed of the need to "separate" from his person a $30.00 cash Book–in–Fee, pursuant to the Hamilton County Pay–for–Stay Program. This separation was not pursuant to an extraordinary or exigent circumstance, but rather was performed pursuant to a County Program that was allegedly promulgated and implemented in compliance with § 341.06.

This separation of funds was not pursuant to the goal of a larger public policy, such as the elimination of illegal drugs or the profits from drug sales, but rather as a blanket and general removal of funds from each and every pretrial detainee regardless of his or her offense, pursuant to an established County policy of prisoner reimbursement for the costs of their confinement. However, it is also undisputed by Defendants that Plaintiff's confinement was due to a computer error and was not caused by any actions of his own making. Nonetheless, Defendants still maintain that they were justified in depriving even an innocent detainee of his funds without a predeprivation notice and a hearing until the charges were favorably adjudicated in his or her favor.

Next, during the processing at the HCJC, Mr. Allen was given a "Waiver" form for him to sign "authorizing" Defendants to separate the $30.00 from Plaintiff's possession. In this case, it was signed by Mr. Allen, but it is further undisputed that regardless of whether he would have signed the Waiver form or not, Mr. Allen's $30.00 in cash would have been "separated" from him by Defendants.

The next day after his arrest, Mr. Allen was able to make bail and proceeded to the HCJC Property Window in order to retrieve his cash and personal possessions. It is undisputed that Mr. Allen was allowed to immediately retrieve his $70.00 in cash, as well as any other personal items he had in his possession during his arrest, but he was informed at that time that his $30.00 Book–in–Fee would not be given back to him until and unless he applied for its return with the HCJC.

Mr. Allen would be expected to wait at least 4–6 weeks before he would be sent his $30.00, presumably by check and without interest. Therefore, in Mr. Allen's case, while it is undisputed that he was denied the use of his $30.00 cash property for a minimum of 4 weeks without interest. Defendants had the full use of his funds for those 4 weeks, presumably to spend, invest and apply as they see fit.

Applying the *Matthews'* factors to the case at bar, we preliminarily find that Mr. Allen had a property interest in his $30.00 cash, he was deprived of that property interest by Defendants pursuant to an established policy, that deprivation was performed without a notice or a hearing, Defendants have put forth insufficient rationales at this stage of the litigation in order to justify depriving Mr. Allen of his property, and finally, Defendants have not shown that they had a valid governmental interest in such property or that there was not a less restrictive method available before the unconstitutional attachment took place.

Accordingly, we preliminarily find that all three of the *Matthews* factors favor Plaintiff, and, therefore, are unable to find in favor of Defendants as a matter of law.

### 3. *Case of Good and the Matthews' Test Favor Plaintiff*

In *Good,* the district court issued a warrant of arrest *in rem* on Good's house, after which the government seized the house. The government allowed Good's tenants to remain in the house, subject to an occupancy agreement directing that future rents be paid to the United States Marshal's Service. *Good,* 114 S.Ct. at 497–98. The *Good* Court determined that

the government had asserted control over Good's property, which amounted to a "seizure." *Id.*, 114 S.Ct. at 504.

However, the *Good* Court indicated that the exercise of authority, short of seizure, would not trigger the notice and hearing requirement. In particular, the government could have filed a *lis pendens* or obtained a restraining order without a pre-deprivation hearing, under the *Matthews'* evaluation, as set forth in *Good. Id.*, 114 S.Ct. at 503.

As stated in *Good*, the County Defendants that are before us bear the burden of demonstrating that exigent circumstances required that the general rule of predeprivation notice and a hearing did not apply in Plaintiff's case. At this stage of the litigation, the County Defendants have failed to meet the burdens as set for in *Good* and the factors of *Matthews*.

Defendants have not demonstrated that they only took measures short of a seizure against Plaintiff's $30.00 cash property, which would not have amounted to a deprivation of Plaintiff's property. *See Good*, 114 S.Ct. at 505; *see also Connecticut v. Doehr*, 501 U.S. 1, 18, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); *429 Main Street*, 52 F.3d at 1421. Therefore, Defendants are not entitled to judgment in their favor as a matter of law under the holdings of *Matthews* and *Good*.

### E. *Ohio Revised Code Section 341.06, As Applied by Defendants*

#### 1. *The Pay–for–Stay Program May Be Unconstitutional*

During the Hearing and in their Motion for Summary Judgment, Defendants defend their actions in this case by asserting that they were merely following the express terms of Ohio Revised Code § 341.06, the "Prisoner Reimbursement Policy," when they enacted the Hamilton County Pay–for–Stay Program requiring the $30.00 Booking Fee. However, this Court is left without sufficient facts in order to decide whether Hamilton County is truly following the terms and provisions of § 341.06, as enacted by the Ohio Legislature in 1996.

During the Hearing and in their Response, Counsel for Defendants, when questioned by this Court, were unable to provide any of the pertinent specifics as to how Hamilton County runs its program, such as: (1) Are the rates charged by the Sheriff's Office on a sliding scale based on the ability of the pretrial detainee to pay? (2) Does the Sheriff's Office conduct a preconfiscation investigation as to the pretrial detainee's legal or moral obligation in supporting a dependent? (3) Does the Sheriff's Office send inquiries to the pretrial detainee's employer or income tax records in order to determine his or her financial status? (4) Does the Sheriff's Office create a repayment plan for those detainees, upon his or her release, who were unable or unwilling to meet the full terms of the Book–in–Fee? (5) Is the Sheriff's Office or its agents, actively pursuing the payment of those detainees who have failed to pay the required $30.00 Book–in–Fee? (6) Have any civil actions been filed against a detainee in order to recover those funds owed to Defendants by the detainee? (6) Have all of those monies collected pursuant to the Book–in–Fee been placed in the County's or the Sheriff's general operating fund? (7) What are the accounting procedure and financial numbers collected by the Sheriff's Office in regard to the Book–in–Fee monies, as opposed to all other general operating funds? (8) Since § 341.06 refers to the "reimbursement" of prisoner related expenses, why is this directive interpreted by Defendants as "prospective reimbursement," instead of reimbursement to the County Defendants after there has been an adjudication of the prisoner's criminal

charges? *See* Ohio Rev.Code § 341.06(A)(2)-(3)

This Court makes a preliminary finding that until or unless these questions are sufficiently answered, we are unable to grant judgment on behalf of Defendants as a matter of law.

### 2. *Any Signed Releases Or Waivers May Be Invalid*

In the case at bar, Defendants made an issue of the fact that Plaintiff had "voluntarily" signed a Waiver authorizing Defendants to "separate" him from his $30.00 Book–in–Fee. In addition, Defendants noted that Plaintiff had not yet applied for the refund that he is still entitled to receive. As the Supreme Court noted in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), a waiver or release may be a defense available to Defendants, but does not affect a valid constitutional claim that may be asserted by Plaintiff.

Moreover, considering the fact that Defendants admit that the $30.00 Book–in–Fee would have been removed regardless of whether Plaintiff signed the waiver or not, it is difficult for this Court to believe that Plaintiff's "Waiver" form was signed voluntarily and knowingly. Furthermore, neither Party to this action has presented any evidence as to the exact facts and circumstances surrounding Plaintiff's signing of the waiver, in order to form a conclusion as to its validity as a waiver of his rights. Therefore, Defendants are not entitled to judgment as a matter of law in regard to Plaintiff's "voluntary" waiver of his rights to the $30.00 Book–in–Fee.

### 3. *Defendants' PostDeprivation Procedures Are Inadequate*

To pursue a § 1983 claim, a plaintiff bears the burden of demonstrating that the available state procedures were inadequate to compensate for the alleged unconstitutional deprivation. *See Parratt v. Taylor,* 451 U.S. 527, 543, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Sutton v. Cleveland,* 958 F.2d 1339, 1349 (6th Cir.1992); *Collyer v. Darling,* 98 F.3d 211, 223 (6th Cir.1996).

The Supreme Court has noted, however, that there are circumstances under which such predeprivation process is either impracticable or impossible. *Parratt,* 451 U.S. at 539, 101 S.Ct. 1908. Where the situation demands quick action or where state officials act randomly and without authorization, the Court has held that adequate post-deprivation remedies are sufficient to satisfy this constitutional requirement. *Id.* at 541, 101 S.Ct. 1908. Where, however, state officials act in accordance with an established state custom or policy, their acts are not "random and unauthorized" and predeprivation process is required. *Id.*

To determine whether Plaintiff has stated a claim for relief under this doctrine, the Court must first ascertain whether Plaintiff was deprived of a protected interest and then decide whether the process provided was sufficient. Thus, in the case at bar, we must determine whether there were predeprivation processes that could have effectively safeguarded those interests. *Id.*

Defendants argue that Plaintiff's rights have not been violated since Hamilton County has provided adequate post-deprivation remedies for Plaintiff in accordance with the holding of *Parratt v. Taylor.* If this Court assumes for the moment that *Parratt* is applicable in this case, we, nonetheless, preliminarily find that the post-deprivation remedies provided by Hamilton County in order to refund detainees their Book–in–Fee may be inadequate.

During the Hearing, Counsel for Defendants admitted that Plaintiff's Book–in–Fee of $30.00 in cash was immediately

taken from Plaintiff's possession upon his arrest and processing at the HCJC. In addition, Counsel informed the Court that Plaintiff had to wait a minimum of 4–6 weeks post-dismissal or acquittal in order to receive his funds from the possession of Defendants.

Furthermore, when received, Plaintiff could expect his funds to be sent to his last known address either by check or some other form of non-cash payment, and certainly without interest. Defendants did not address the circumstances that would result if a former pretrial detainee applied for and received his refund by check, despite the fact that he or she may not have access to a checking account in order to receive his or her funds. It is likely that the detainee would then be required to attempt to find a financial institution that would cash his or her check in exchange for a percentage of that check. The result of that search would likely be that the detainee would receive less money than him or her initially gave to Defendants, all without the benefit of predeprivation notice and a hearing.

Defendants' Counsel also admitted that, while it is true that Plaintiff could retrieve his $70.00 in cash and personal possessions that were taken upon processing at the HCJC almost immediately upon release, dismissal or acquittal at the HCJC's Property Window, the County Defendants were not able or not willing to provide such an immediate cash refund to Plaintiff of his Book–in–Fee at the HCJC's Property Window. When questioned by this Court as to what happens to the former detainee's Book–in–Fee if the detainee moves, dies, becomes incapacitated, the refund is not received in 4–6 weeks or under other scenarios that may develop, Defendants' Counsel were unable to provide this Court with sufficient answers to such clearly foreseeable problems.

So in essence, Defendants have set up a complicated, post-deprivation remedy that immediately benefits Defendants with the use and enjoyment of Plaintiff's property. However, upon the detainee's release, dismissal or acquittal, Plaintiff is denied the immediate return of his funds and may have to take on the additional burden of pursuing additional measures in order to see to it that his funds are returned.

The Court asks a very simple question in this case. "What is the reason why Defendants cannot return a detainee's Book–in–Fee as easily and quickly as Defendants return a detainee's other funds and property upon his release?" Defendants post-deprivation remedies in this case appear to be inadequate, possibly unconstitutional, and filled with foreseeable procedural problems. The burden appears to be too great on Plaintiff, while the benefits appear to be too great in favor of Defendants.

In addition, if the Court assumes for the moment that Defendants' position is reasonable in this case, what is there to stop Defendants from relying on § 341.06 in assessing every pretrial detainee their estimated court costs or criminal fine before they are given notice and a hearing. If the rationale for depriving this Plaintiff of the Book–in–Fee before he is given his due process rights is considered to be rational and constitutional, why not go to the next step and assess and deduct from all pretrial detainees the expected court costs and criminal fines they would normally be assessed if convicted. Then, Defendants can offer to refund a detainee's funds if his or her charges were dismissed or found not guilty at trial. However, it is very doubtful that Defendants would enact such a policy for the very same reasons we find that their Book–in–Fee Program is probably unconstitutional, as applied under the

Due Process Clause of the Fourteenth Amendment.

Defendants argue that the Attorney General wrote Opinion Letter 99–021 supporting a similar pay-for-stay program that was enacted in another county in Ohio. However, during the Hearing, when Counsel for the Attorney General's Office was directly asked by this Court as to the Attorney General's position in regard to the constitutionality of Hamilton County's implementation of § 341.06, he took a decidedly neutral stance and would not affirmatively endorse Defendants' application of § 341.06.

The Court finds this to be both puzzling and troubling, because according to Defendants, they were merely enacting and following the terms and provisions of § 341.06. However, Counsel for the Attorney General's Office would not go on the record as to confirming that this was accurate. Therefore, the Court finds that we are unable to grant judgment in Defendants' favor as a matter of law.

### F. *Ohio Revised Code Section 341.06 May Be Unconstitutional*

#### 1. *Introduction*

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Leslie v. Lacy,* 91 F.Supp.2d 1182, 1185–86 (S.D.Ohio 2000) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

 To establish a facial violation, a challenger "has to show that the provisions were wholly inadequate to protect due process rights[.]" *Leslie,* 91 F.Supp.2d at 1186 (quoting *Nelson v. Diversified Collection Serv., Inc.,* 961 F.Supp. 863, 868 (D.Md. 1997)). "A statute can violate procedural due process rights as applied if the notice and opportunity to be heard either were not provided to the plaintiff or their provision was inadequate." *Id.*

During the course of this litigation, Plaintiff's Counsel has on several occasions emphasized to this Court that he was only attacking Ohio Revised Code § 341.06, as applied in Hamilton County, but was not necessarily attacking the statute on its face.

However, Defendants' Counsel has also pointed out to this Court that Plaintiff has on several other occasions appeared to be attacking § 341.06 on its face as well. In addition, the Intervenor Attorney General has taken the position that, as long as Plaintiff is not directly attacking § 341.06 on its face, she has taken no position in this case as to the validity of the Hamilton County Pay–for–Stay Program (docs. 17 & 22).

When reviewing the constitutionality of the Hamilton County Pay–for–Stay Program, it is difficult and almost counterproductive to view such a program in a vacuum. Because, if we find that § 341.06 is unconstitutional on its face, then we can also conclude that the Hamilton County Pay–for–Stay Program is unconstitutional. However, the reverse is not necessarily true.

For example, after reviewing § 341.06, this Court may find some constitutional problems exist that may require us to abstain and certify the review to the Ohio Supreme Court, which has already been suggested by the County Defendants and the Intervenor. Furthermore, we may also find that § 341.06 is constitutional on its face requiring no further review, but nonetheless, we find the Hamilton County Pay–for–Stay Program to be unconstitutional, as applied.

#### 2. *Section 341.06 May Not Provide Adequate Due Process.*

 We are unable to resolve this issue at this point in the litigation as a

matter of law in Defendants' favor. Nonetheless, this Court does preliminarily find that there may be constitutional problems with § 341.06 for the following reasons.

First, this Court must abide by the "well-established principle that statutes will be interpreted to avoid constitutional difficulties." *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 514, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). Having read the terms and provisions of § 341.06, we find the most glaring evidence that there may well be constitutional problems with this statute as applied and on its face is the use of the word "reimbursement" throughout the text of the statute. Black's Law Dictionary defines "reimbursement" as having "[t]o pay back, to make restoration, to repay that expended; to indemnify, or make whole." Blacks Law Dictionary 891 (6th ed.1991). Thus, a facial reading of the statute implies the confiscation or payment by a prisoner or detainee of confinement costs is only to be "repaid" by the prisoner or detainee, and not to be attached, seized, or taken from his or her person immediately upon arrest and booking. A simple reading of § 341.06 is totally devoid of any reference to a pre-hearing seizure, prospective reimbursement, or the need to make the county or sheriff whole prior to the prisoner's or detainee's criminal adjudication. Accordingly, either the County Defendants are in error in applying the statute, or the statute itself needs to be further defined as to what is meant by the term "reimbursement," and exactly when should such reimbursement be made by a prisoner or detainee.

Second, § 341.06 contains no explicit provisions for notice to the pretrial detainee or a hearing prior to the taking or seizure of the detainee's $30.00 prisoner reimbursement fee, nor does it include any provision for notice or a hearing after the acquittal or dismissal of the pretrial detainee criminal charges.

While it is true that, § 341.06(A)(2)-(3) does appear to strongly indicate that the application of this statute will be applied post-judgment after a thorough review and assessment of the convicted prisoner's background has been investigated, it, nonetheless, does not explicitly direct the counties and sheriffs to provide such notice and hearing to pretrial detainees.

Third, nowhere in § 341.06 does it state that the terms of the statute are applicable to pretrial detainees, unconvicted prisoners, or to those persons otherwise awaiting trial. Instead, the statute in question ambiguously seems to apply to such persons described only as "offenders," "confined persons," and "prisoners." While other similar, but unambiguous prisoner reimbursement statutes, such as Ohio Revised Code § 341.19, expressly state that it applies only to persons who are either "convicted of an offense," "convicted of a felony," or "pleads guilty to an offense." *See also* Ohio Rev.Code § 341.14.

Fourth, one could interpret this statute as overly broad, vague, giving "unfettered discretion" in its application to county sheriffs statewide, not providing sufficient notice to pretrial detainees and prisoners as to exactly what the reimbursement policy parameters will be from county to county, and finally, not providing an adequate or explicit pre- or post-deprivation remedy before the pretrial detainees or prisoners are deprived of their funds.

In addition, the Intervenors and Defendants have not identified any significant burdens which would be placed upon the State if the statute was to explicitly require predeprivation notice and hearing. The State has offered the use of its legislative system to Defendants in order to promulgate a "Prisoner Reimbursement Policy." *See* Ohio Rev.Code § 341.06. The

State could have also explicitly required counties like Hamilton to provide predeprivation due process before the taking of prisoner reimbursement fees.

No valid reason has been offered for denying pretrial detainees the due process protections afforded by judicial participation, before those detainee's $30.00 cash property is seized, taken, or attached by the Defendants. *See Leslie,* 91 F.Supp.2d at 1192.

Therefore, this Court preliminarily concludes that the "Prisoner Reimbursement Policy" provisions of § 341.06(A) may not afford the pretrial detainee the process which is due him or her under the Constitution, in that the pretrial detainee is given no predeprivation notice, or hearing prior to the detainee's deprivation of his or her $30.00 Book–in–Fee, and may be ambiguous on its face as to which persons in this State are affected by its provisions. *Id.* at 1193.

Even assuming for the moment that post-deprivation notice and hearing would be permissible under exigent circumstances, the statute does not contain an exception for exigent circumstances, nor does the statute explicitly provide guidelines for an established and constitutionally adequate post-deprivation notice and a hearing. *Id.*

The Plaintiff in this case was given no notice or opportunity for a hearing before his $30.00 Book–in–Fee was taken, seized, and/or attached by Defendants during his July 1999 arrest and processing at the HCJC. Nor was Plaintiff given any prompt post-deprivation notice or hearing. *Id.* Since this Court seriously questions whether any circumstances exist in which Ohio Rev.Code § 341.06, as currently worded, would comply with the requirements of due process, the Court finds that the statute may be unconstitutional on its face, as well as applied in this case. *Id.*

In fact, during the Hearing, Counsel for the Attorney General's Office admitted that § 341.06 has no provisions for time, place or manner in which to apply the terms and provisions of the statute. In other words, a reading of § 341.06 on its face fails to inform the reader as to whether a pre- or post-deprivation remedy is provided, guidelines to enacting a post-deprivation remedy, exactly how much the reimbursement expenses should be, should there be notice and a hearing, when does that occur, does this statute apply to pretrial detainees or convicted prisoners or both, would a post-judgment assessment of costs and expenses be adequate, and several other specifics seem to be wanting as to the language of § 341.06.

### 3. *The Uniformity Clause of the Ohio Constitution*

#### a. Introduction

The Uniformity Clause, Article II, Section 26, of the Ohio Constitution, which ensures that all laws within Ohio are applied uniformly states, in pertinent part:

> All laws, of a general nature, shall have a uniform operation throughout the State; nor, shall any act, except such as relates to public schools, be passed, to take effect upon the approval of any other authority than the General Assembly, except, as otherwise provided in this constitution.

*Mixon v. State of Ohio,* 193 F.3d 389, 408 (6th Cir.1999) (quoting Ohio Const. Art. II, Sec. 26).

In reviewing legislation under the Uniformity Clause, Ohio courts use a two-part test: (1) whether the subject matter at issue is one of a general or special nature, and, if one of a general nature, (2) whether the legislation operates uniformly throughout Ohio. *See Desenco, Inc.,* 706 N.E.2d at 330.

During the Hearing, Counsel for the Attorney General's Office admitted that § 341.06 does not direct or provide guidance to the various Ohio counties and sheriff's offices in how to apply the terms and provisions of the policy in reference to time, place, manner, notice, or a hearing.

Based on this admission, the Court can reasonably assume that while Hamilton County's version of § 341.06 is administered in a certain manner, there are likely other Ohio counties and sheriff's offices that administer § 341.06 in a completely different way than the one at issue here. That would place § 341.06 in jeopardy of violating the Ohio Uniformity Clause of the Ohio Constitution.

However, since none of the Parties have addressed this issue in their briefs or have presented evidence to the contrary, we are unable to rule that § 341.06 is unconstitutional as a matter of law at this time.

Nonetheless, because of the fact that § 341.06 appears to be lacking the requirement of a pre- or post-deprivation notice and hearing, the statute could be vulnerable to constitutional attack. For example, there is the real potential for the "arbitrary and capricious" application by various county and sheriff officials throughout the State, as well as by giving "unfettered discretion" to those government officials in enacting prisoner reimbursement policies, such as the one in place in Hamilton County.

## V. *THE PULLMAN ABSTENTION DOCTRINE*

### A. *Introduction*

It is well established that federal courts have a duty to adjudicate controversies before them. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727–28, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The Supreme Court has described this duty as "virtually unflagging." *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

Nevertheless, there are several "extraordinary and narrow" exceptions to this rule which allow92 a federal court to dismiss a case despite the fact that it has jurisdiction. *Quackenbush*, 517 U.S. at 728, 116 S.Ct. 1712. The Supreme Court has emphasized that, even "in the areas in which such 'abstention' is permissible, ... it remains 'the exception, not the rule.'" *New Orleans Pub. Serv. v. Council of City of New Orleans*, 491 U.S. 350, 359, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)); *see also Colorado River Water Conservation Dist.*, 424 U.S. at 813, 96 S.Ct. 1236. "[W]here uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236–37, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)).

### B. *Railroad Comm'n of Texas v. Pullman Co.*

Of all the abstention doctrines, the only one that appears applicable to the instant case is known as the "*Pullman* abstention doctrine." The *Pullman* Abstention Doctrine is derived from a case in which a Fourteenth Amendment, Equal Protection Clause challenge to a Texas railroad personnel regulation was held to have been prematurely adjudicated in federal court, since a state court's consideration might

have rendered the regulation invalid on state law grounds and rendered the federal constitutional question as moot.

 According to the doctrine established in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court should abstain from deciding the unconstitutionality of an unclear state law until a state court has considered and clarified the law thereby making the federal court's constitutional ruling unnecessary. "If there is a substantial possibility that a state court could interpret an unconstitutionally vague statute to avoid being declared unconstitutional, then the federal court should abstain from deciding the constitutionality of the statute." *Michigan Wolfdog Ass'n, Inc. v. St. Clair County*, 122 F.Supp.2d 794, 801 (E.D.Mich.2000) (citing Chemerinsky, *Federal Jurisdiction* § 12.2.1).

 "If, however, a state statute is so vague that persons to whom it applies cannot understand what is required of them, then a federal court need not abstain because it is unlikely that a state court could narrowly interpret the statute enough to avoid a constitutional question." *Michigan Wolfdog Ass'n*, 122 F.Supp.2d at 801; *see also Procunier v. Martinez*, 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Baggett v. Bullitt*, 377 U.S. 360, 377–78, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

According to the United States Supreme Court:

> In the case where applicability of the statute is uncertain, abstention is often proper, while in the case where the vagueness claim goes to the obligations imposed by the statute, it is not, since a single state construction often would not bring the challenged statute "within the bounds of permissible constitutional certainty."

*Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 86 n. 9, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975) (quoting *Baggett*, 377 U.S. at 378, 84 S.Ct. 1316).

**C. *The Pullman Doctrine May Not Be Applicable In This Case***

 The *Pullman* abstention may not be appropriate here. Though an authoritative statutory interpretation by Ohio courts would possibly settle this case, Plaintiff has not sought relief in the Ohio courts. *See Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir.1999). However, it is also true that "[a] federal court owes no duty to abstain in deference to a state court when a federal constitutional question is at issue." *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 740 (6th Cir.2000).

To the extent that the *Pullman* Abstention Doctrine applies only to a vague statute, this Court cannot conclude at this preliminary stage that there is sufficient justification for us to abstain. *See Summit County Crisis Pregnancy Center, Inc. v. Fisher*, 830 F.Supp. 1029, 1032 (N.D.Ohio 1993) (holding that the *Pullman* Abstention Doctrine was not warranted because the defendant failed to show that the statute in question was vague).

The Court finds that there are too many genuine issues of material fact which exist in order for us to decide at this stage of the litigation as to whether the *Pullman* Abstention Doctrine should apply to the facts of this case. Therefore, this Court will not certify the issue to the Ohio Supreme Court in regard to the facial constitutionality of § 341.06 at this time.

**VI. *CONCLUSION***

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admis-

sions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* The evidence must be viewed in a light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Having reviewed this matter and for the reasons set forth above, this Court CONCLUDES that there exist genuine issues of material fact that precludes a finding in favor of Defendants as a matter of law in regard to Count I of Plaintiff's Complaint, as explained in the Discussion Section of this Order, and, therefore, Defendants' Motion for Summary Judgment is DENIED (doc. 18).

Accordingly, for the reasons set forth above, the Court hereby: (1) GRANTS the Attorney General's Motion for Intervention (doc. 17); (2) EXTENDS the Intervenor's time to file a Response, which has already been filed and reviewed by this Court (*Id.*); (3) DISMISSES WITHOUT PREJUDICE Plaintiff's Motion for a Preliminary Injunction against the County Defendants (doc. 8); (4) DISMISSES WITHOUT PREJUDICE Plaintiff's claims for relief in the form of compensatory and punitive damages against the County Defendants (doc. 1); and (5) DENIES Defendants' Motion for Summary Judgment (doc. 18).

In addition, the Court hereby SCHEDULES a status conference in this matter for all of the Parties to this action on Tuesday, June 19, 2001, at 3:00 P.M.

SO ORDERED.